Tracy Keenan WYNN, et al., Plaintiffs,

v.

NATIONAL BROADCASTING
COMPANY, INC., et al.,
Defendants.

No. CV 00–11248SVW(RZx).

United States District Court,
C.D. California.

Jan. 24, 2002.

Dolly M. Gee, Schwartz Steinsapir Dohrmann & Sommers, Los Angeles, CA, Paul C. Sprenger, Michael D. Lieder, Daniel Wolf, Steven M. Sprenger, Jane Lang, Sprenger & Lang, Maia Caplan, Kator Scott & Parks, Washington, DC, William T. Payne, William T. Payne Law Offices, Pittsburgh, PA, Thomas W. Osborne, Daniel B. Kohrman, Laurie A. McCann, AARP

Foundation Litigation, Washington, DC, for plaintiffs.

James N. Adler, Henry Shields, Jr., Harry Arthur Mittleman, Irell & Manella, Los Angels, CA, Andrea R. Hartman, James M. Lichtman, Burbank, CA, for National Broadcasting Co., Inc., NBC Studios, Inc.

Nicole Ann–Jeannette Gustafson, Jane Howard–Martin, Morgan Lewis & Bockius, Los Angeles, CA, Timothy H. Lee, Ford & Harrison, Los Angeles, CA, Grace E. Speights, Morgan Lewis & Bockius, Washington, DC, George A. Stohner, Morgan Lewis & Bockius, New York City, for Viacom, Inc., CBS Broadcasting, Inc., United Paramount Network, Viacom Productions, Inc., Spelling Entertainment, Inc., Spelling Television, Inc., Spelling Daytime Television, Inc., Aaron Spelling Productions, Inc., Big Ticket Television, Inc., Big Ticket Productions, Inc., Dreamworks SKG TV LLC, Carsey–Werner Co., LLCCarsey–Werner Productions LLC.

Vilma S. Martinez, Glenn D. Pomerantz, Allison B. Stein, Monica Wahl Shaffer, Munger Tolles & Olson, Los Angeles, CA, for Universal Television, Inc., Universal Television Entertainment, Inc., Universal Television Enterprises Productions, Inc.

James E. Curry, White O'Connor Curry Gatti & Avanzado, Los Angeles, CA, for Studios USA LLC.

Scott H. Dunham, Gordon E. Krischer, Apalla U. Chopra, O'Melveny & Myers, Los Angeles, CA, for Time Warner Entertainment Co., LP, WB Network Partners LP, Warner Bros. Television, Castle Rock Television, Inc.

Jeffrey F. Webb, Gibson Dunn & Crutcher, Los Angeles, CA, Vilma S. Martinez, Glenn D. Pomerantz, Allison B. Stein, Monica Wahl Shaffer, Munger Tolles & Olson, Los Angeles, CA, Ann K. Calfas, Fox Group Legal Dept., Los Angeles, CA, for Fox Entertainment Group, Inc., Fox Broadcasting Co., Twentieth Television, Inc., Twentieth Century Fox Television, Regency Television, LLC, Greenblatt Janollari Studio, Inc.

Paul Grossman, J. Al Latham, Jr., Kelley L. Sbarbaro, Paul Hasting Janofsky & Walker, Los Angeles, CA, for Walt Disney Co., ABC Inc., Walt Disney Pictures & Television, Touchstone Television Productions, LLC, Miramax Productions, Inc., Buena Vista Television.

William L. Cole, Kevin E. Gaut, Patricia H. Benson, Adam Levin, Mitchell Silberberg & Knupp, Los Angeles, CA, for Columbia Tristar Television Inc.

Nancy P. McClelland, Elisabeth C. Watson, Gibson Dunn & Crutcher,m Los Angeles, CA, William T. Rintals, G. Howden Fraser, Michael B. Garfinkel, Emily Peters, Rintala Smoot Jaenicke & Rees, Los Angeles, CA, Anthony J. Oncidi, Dana Cephas, Akin Gump Strauss Hauer & Feld, Los Angeles, CA, for William Morris Agency, Inc., United Talent Agency, inc., Shapiro–Lichtman, Inc., Lucy Stille & Associates, Inc., Irv Schecter Co., International Creative Management, Inc., Gersh Agency Inc., Endeavor Agency, LLC, Creative Artists Agency, Inc., Broder Kurland Webb Agency, Inc., Agency for the Performing Arts, Inc.

## ORDER GRANTING IN PART DEFENDANTS' MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTION TO SEVER

WILSON, District Judge.

### I. INTRODUCTION

This action is brought under the Age Discrimination Employment Act ("ADEA"), California's Fair Employment and Housing Act ("FEHA"), and New York State's Human Rights Law

("NYHRL"), as well as the Labor Management Relations Act ("LMRA") and common law claims. Plaintiffs, 51 individual television writers, allege that they have been the victims of an industry-wide "pattern or practice" of age discrimination, perpetrated by Defendants, 50 separate entities in the television industry, ranging from broadcasting companies to talent agencies. Pursuant to this Court's request that the parties attempt to consolidate their briefings, the 40 network and studio defendants ("Employer Defendants") and the 11 talent agency defendants ("Agency Defendants") have each filed consolidated motions to dismiss, and, in the alternative, to sever both Plaintiffs and Defendants as improperly joined, under Fed.R.Civ.P. 12(b)(6), 20, and 21. Defendant Studios USA has joined Employer Defendants and Agency Defendants in their motions to dismiss and sever, but has brought a separate motion to dismiss on grounds unique to Studios USA.

For the reasons set forth below, the Court grants in part Employer Defendants' and Agency Defendants' motions to dismiss, grants Employer Defendants' and Agency Defendants' motions to sever, and grants Studio USA's motion to dismiss.

## II. STATEMENT OF FACTS

Plaintiffs consist of 50 former or current writers for television programming, who all claim to be members of the Writers Guild of America (the "Guild"). Plaintiffs reside in various states and Canada, although a majority of Plaintiffs reside in California. They range in age from early forties to late seventies. Each Plaintiff alleges a different background in terms of qualifications and experience. They each claim to have written for different television programs, which run the gamut from comedies to dramas to westerns to children's shows. Some Plaintiffs have written for one or two programs, while others have written for a multitude of programs. Some Plaintiffs claimed to have had work as recently as 1999, while others have allegedly not obtained work since the early 1980s. There are Plaintiffs that allegedly have won awards for their work, while many others make no such allegations.

Plaintiffs each allege that they have been a victim of a pattern or practice of age discrimination in the television industry. However, not one Plaintiff has alleged that he or she applied for a specific writing position available with a specific Defendant. Instead, most claim to have "made efforts" to obtain employment with certain Employer Defendants, and claim to have "sought, without success, to obtain representation" from certain Agency Defendants. *See, e.g.,* Plaintiffs' First Amended Complaint ("FAC"), at ¶¶ 110–11, 137–38, 237–38. Many of these alleged efforts had manifested in different ways. Some Plaintiffs only sought to contact Employer Defendants via Agency Defendants, while others used direct contacts. Some Plaintiffs claim to have obtained agents, while some others claim to have lost their agents. Some Plaintiffs have apparently not contacted any Employer Defendants at all, either directly or indirectly.

According to Plaintiffs' complaint, the 51 Defendants consist of 40 Employer Defendants and 11 Agency Defendants.[1] The Employer Defendants consists of entities in the television industry that employ writ-

---

1. At one point in the complaint, Plaintiffs allege that there are twelve Agency Defendants in this case. *See* FAC, at ¶ 320. However, Plaintiffs only specifically name eleven Agency Defendants in the relevant portion of their complaint. *See* FAC, at ¶ 70–80. It appears that one Defendant, Brillstein–Grey Management, LLC, may operate as both an Employer Defendant and an Agency Defendant. *See* FAC, at ¶ 69.

ers of television programming in any of three capacities: "staff writer," "freelance writer" and "show runner." The Employer Defendants are subdivided into two subgroups, Studio Defendants and Network Defendants. The Studio Defendants, according to the complaint, have been in the business of developing, producing, and/or distributing television programming for broadcast on the various networks. The Network Defendants, Plaintiffs allege, have been principally in the business of broadcasting television programming via a network of affiliated television stations, and, in certain instances, have also been involved in the business of producing such programming. Plaintiffs further assert that most Employer Defendants are part of larger corporate families (termed by Plaintiffs as "Employer Defendant Families"), which have parent corporations known in this case as Parent Defendants. Plaintiffs claim that all Employer Defendants are bound by the terms of the Theatrical and Television Basic Agreement with the Guild (the "Collective Bargaining Agreement" or "CBA").

Plaintiffs identify the Agency Defendants as entities in the television industry that operate or have operated a talent agency. In the regular course of business, Agency Defendants represent television writers and refer or recommend such writers to employers, such as Employer Defendants, for employment and/or employment opportunities.

According to Plaintiffs, since at least the early 1980s, virtually every major studio, network and talent agency in Hollywood has engaged in a systematic pattern or practice of age discrimination against television writers. Plaintiffs seek to certify two umbrella classes consisting of (1) all television writers who have been denied employment by, and/or been deterred from seeking employment with, one or more of the Employer Defendants because of their ageist hiring practices, and (2) all television writers who have been denied representation and employment referral by, and/or been deterred from seeking representation from, one or more of the Agency Defendants because of their ageist representation and referral practices.

Plaintiffs also seek to join all Defendants into a single action. Plaintiffs claim that "[b]y virtue of their having contributed to the industry-wide practice of age discrimination, the conduct of each of the Defendants has been a substantial factor in causing indivisible injury to each class member who was discouraged from seeking employment as a result of that practice." FAC, at ¶ 14. Furthermore, "numerous linkages among all of the Defendants bind them together and make them responsible, both as a factual and legal matter, for the discriminatory practices of other Defendants. In view of these linkages, all such Defendants should be joined in a single action to ensure the efficient adjudication of common issues and a final and comprehensive resolution of the controversy." FAC, at ¶ 16.

Plaintiffs' First Cause of Action alleges that Employer and Agency Defendants have violated § 623 of the ADEA (29 U.S.C. § 623), §§ 12940 and 12941 of the FEHA (Cal. Gov't Code §§ 12940 and 12941), and § 296 of the NYHRL (N.Y. Exec. Law § 296). Plaintiffs' Second Cause of Action alleges that Agency Defendants have aided and abetted Employer Defendants in willful violation of § 623 of the ADEA, § 12940 of the FEHA, and § 296 of the NYHRL. It also alleges that Employer Defendants aided and abetted Agency Defendants, Network Defendants aided and abetted Studio Defendants, and Parent Defendants aided and abetted their subsidiaries, in willful violation of § 12940 of the FEHA, and § 296 of the

NYHRL. Plaintiffs' Third Cause of Action alleges that each member of each of the Employer Defendant Families conspired with one another to violate § 12940 of the FEHA and § 296 of the NYHRL. Plaintiffs' Fourth Cause of Action alleges that each Employer Defendant breached the CBA and, hence, is in violation of § 301 of the Labor Management Relations Act (LMRA) (29 U.S.C. § 185). Finally, Plaintiffs' Fifth Cause of Action alleges that Agency Defendants tortiously interfered with Employer Defendants' obligations under the CBA, Network Defendants tortiously interfered with Studio Defendants' obligations under the CBA, and Parent Defendants tortiously interfered with their subsidiaries' obligations under the CBA.

## III. FIRST CAUSE OF ACTION: AGE DISCRIMINATION (ADEA, FEHA, NYHRL)

### A. TIMELINESS OF COMPLAINT

■ It is undisputed that Plaintiffs in this ADEA action must file a charge with the EEOC within at least 300 days of the alleged unlawful discrimination. *See* 29 U.S.C. § 626(d). The Ninth Circuit "treats this notice requirement as a statute of limitations." *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 674–75 (9th Cir. 1988). Furthermore, as numerous courts have suggested, a purported class action will be dismissed unless at least one class member has filed a timely administrative charge of discrimination. *See, e.g., Moo-*

*ney v. Aramco Servs. Co.*, 54 F.3d 1207, 1223 (5th Cir.1995) (noting that the "piggybacking" rule allows a plaintiff who has not filed a timely EEOC charge in an ADEA class action to join a plaintiff who has filed the required administrative charge).[2]

■ Here, Agency Defendants claim that Plaintiffs' action is time-barred, because, according to Defendants, no Plaintiff has alleged facts, either in the present complaint or in their respective EEOC charges, to support a claim that he or she sought representation from any specific Agency Defendant within the requisite time period, which is 300 days prior to the filing of the EEOC charge. Instead, Plaintiffs' EEOC charges allege only that they were *deterred* from seeking representation during that limitation period.[3]

■ The Ninth Circuit has held that when a class of plaintiffs are alleging a continuing violation of a discriminatory practice, as is the case here, "each class member must demonstrate, by fact of employment *or otherwise,* that he or she had been discriminated against during the limitation period or *was a member of a group exposed to discrimination during that time.*" *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1443 (9th Cir.1984) (emphasis added). By alleging that they were deterred from applying because of Defendants' allegedly ageist hiring or referral policies occurring during the limitations period, that is a legitimate allegation of discrimination, and thus satisfies the

---

**2.** Defendants are not arguing that Plaintiffs have failed to file charges with the appropriate federal and, with regard to the state law claims, state agencies. It is the timeliness and sufficiency of those charges that are being disputed.

**3.** Agency Defendants request that the Court take judicial notice of the administrative charges filed by Plaintiffs with the EEOC, pursuant to Fed.R.Evid. 201(b). *See* Talent

Agency Defendants' Request for Judicial Notice in Support of Their Motion to Dismiss ("Defendants' Request for Judicial Notice"), at 5, Ex. C. Plaintiffs concede that judicial notice of the EEOC charges is proper in this instance. *See* Plaintiffs' Consolidated Memorandum of Points and Authorities in Partial Opposition to All Defendants' Requests for Judicial Notice, at 1.

requirements for timeliness.[4] "[P]laintiffs' charges are timely if they were subject to and affected by a continuing discriminatory policy during the charge-filing period. If a plaintiff is subject to a continuing policy of discrimination, it does not matter when the plaintiff first learned of that policy as long as she was subject to the policy and affected by it within the charge-filing period." *Sandoval v. Saticoy Lemon Ass'n,* No. 88–2257, 1989 WL 407330 at *3, 56 F.E.P. Cas. (BNA) 1745 (C.D.Cal. May 23, 1989). Furthermore, as stated in their complaint, "Plaintiffs have, during the liability period, sought, and/or been deterred from seeking, representation from Agency Defendants, as a result of their discriminatory representation and employment referral policies or practices." FAC, at ¶ 400.

■ Agency Defendants argue primarily that such a deterrence theory is available only in the most dire of employment situations, which does not appear to be the case here, based on the facts as Plaintiffs have alleged them. While it is true, as discussed in detail below, that a deterred applicant theory is not available in every case that alleges a "pattern or practice" of discrimination, the Court at this time declines to make a dispositive ruling on its availability to Plaintiffs. Thus, for the purposes of the timeliness contention, the

Court will assume that the deterred applicant theory is properly pled, and only determine whether it was brought within the requisite time period.[5] Since Plaintiffs have alleged that they have either sought or were deterred from seeking representation or employment from Defendants during the limitations period, their claims under the ADEA are not time-barred under the appropriate Rule 12(b)(6) standards.[6]

Additionally, because state and federal anti-discrimination laws are often quite similar, courts regularly look to applicable federal precedent when applying state anti-discrimination statutes. *See, e.g., Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 354, 100 Cal.Rptr.2d 352, 8 P.3d 1089 (2000). Here, since there appears to be no state precedent differing on the subject, Plaintiffs claims under the FEHA and the NYHRL are also deemed timely.

### B. JOINDER

Under Fed.R.Civ.P. 20(a), Plaintiffs seek to join 50 individual television writers in a single action against 40 Employer Defendants, subdivided into Studio Defendants, Network Defendants, and Parent Defendants, although not exclusively, as well as 11 Agency Defendants, including one employer that Plaintiffs are apparently suing

---

4. As discussed below, Plaintiffs' complaint is dismissed because, among other things, it fails to satisfy the requirements under Fed. R.Civ.P. 12(b)(6). However, were Plaintiffs' complaint otherwise proper, it would not have been untimely.

5. Whether Plaintiffs actually have valid grounds for a discrimination claim—under a deterred applicant theory or otherwise—is discussed in greater detail below. However, if Plaintiffs do not have valid grounds on which to base a deterred applicant theory, as Agency Defendants argue here, then many Plaintiffs would not have a viable claim for discrimination, regardless of the timeliness of their complaint. Therefore, it is unnecessary

to base the ruling on the timeliness issue on the grounds of whether Plaintiffs can permissibly assert a deterred applicant theory.

6. A statute of limitations defense is permissibly asserted by Defendants in a motion to dismiss if the running of the statute is apparent on the face of the complaint or in documents outside of the pleadings that the Court is willing to consider. *See, e.g., Jablon v. Dean Witter & Co.,* 614 F.2d 677, 682 (9th Cir.1980). Since Defendants have failed to carry their burden that Plaintiffs' complaint is untimely under these standards, their motion to dismiss fails on these grounds.

as an Employer Defendant but which also operates as a talent agency.

### 1. Joinder of Defendants

 Fed.R.Civ.P. 20(a) allows for joinder of defendants in a single action "if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences, and if any question of law or fact common to all defendants will arise in the action." Thus, a party seeking joinder must assert (1) a right to relief based on the same transaction or occurrence, and (2) a common question of law or fact with respect to all parties. *See Desert Empire Bank v. Insurance Co. of No. America,* 623 F.2d 1371, 1375 (9th Cir.1980); *Nassau Co. Ass'n of Ins. Agents v. Aetna Life & Cas. Co.,* 497 F.2d 1151, 1154 (2d Cir.1974); *see also* 7 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and Procedure,* § 1653 (3d ed.2001). These requirements must be satisfied in order to *allow* for joinder under Rule 20(a), however, even if these requirements are satisfied, there is no requirement that the parties *must* be joined. "Rule 20(a) is permissive in character; joinder in situations falling within the rule's standard is not required ..." 7 Wright, Miller, & Kane, *Federal Practice and Procedure,* § 1652, at 395–96. Moreover, Rule 20(b) and Rule 21 require the trial court to "examine the other relevant factors in a case in order to determine whether the permissive joinder of a party will comport with the principle of fundamental fairness." *Desert Bank,* 623 F.2d at 1375. "A determination on the question of joinder of parties lies within the discretion of the district court." *Puricelli v. CNA Insurance Co.,* 185 F.R.D. 139, 142 (N.D.N.Y. 1999) (citing *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1332 (8th Cir.1974)).

### a. Same Transaction or Occurrence

 Plaintiffs assert that the requirements for permissive joinder are satisfied because they are alleging an industry-wide "pattern or practice" of discrimination. Therefore, according to Plaintiffs, all Defendants are jointly responsible for this practice and thus should be joined together for the purposes of relief.

Notwithstanding their contention, Plaintiffs have not properly satisfied the first prong of Rule 20(a), requiring the right to relief to arise out of the same transaction or occurrence. As understood from Plaintiffs' complaint, Defendants are 51 separate entities, each with distinct hiring and firing practices, and with a multitude of separate individuals in charge of determining these practices for each of the separate entities. Plaintiffs are 50 individuals, some of whom have worked for a few of the employers, some of whom have barely worked for any of the employers, some of whom have applied to work for many of the employers, and some of whom have not applied to work for any of the employers. The mere assertion that because these employers and talent agencies are members of a common industry is not sufficient to satisfy the requirement that the right to relief against all Defendants arises out of the same transaction or occurrence.

Plaintiffs do not contend that every Defendant is involved in every other Defendant's hiring and firing decisions, yet they still contend that the employers should be joined because of an industry-wide pattern and practice of age discrimination in the hiring of television writers. Such a "pattern-or-practice" claim is modeled on the Supreme Court's decision in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). As discussed further

below, at the initial stage of a "pattern-or-practice" claim, the burden is on the plaintiff to establish a prima facie case that a discriminatory policy existed. *Id.* at 360, 97 S.Ct. at 1867. However, nowhere in that case does it suggest that a plaintiff or group of plaintiffs may proceed without being able to identify a collective or controlling entity (either formal or informal) from which this industry-wide discriminatory policy could originate. Even when construing all factual allegations in favor of Plaintiffs and assuming Plaintiffs can successfully allege a discriminatory "pattern-or-practice" against each Defendant individually, there is still no rationale behind requiring all Defendants to defend each other collectively.

In one attempt to demonstrate the validity of this collective "pattern-or-practice" claim, Plaintiffs submitted a diagram of boxes, circles, squares, and triangles connected by an inordinate and indecipherable configuration of "squiggly" lines, attached to the heading, "The Defendants are Inextricably Intertwined in the Hiring Process (simplified illustration)." *See* Plaintiffs' Consolidated Memorandum of Points and Authorities in Opposition to All Defendants' Motions to Dismiss and to Sever ("Plaintiffs' Opp'n"), Appendix B. This offers absolutely no guidance in demonstrating why 51 separate hiring entities should be joined to defend against what the Plaintiffs claim is a uniform hiring practice.

In fact, Plaintiffs have failed to cite—and this Court has not found—a single authority in which a plaintiff was permitted to join separate employers in an industry, for any reason, much less based solely on their classification as an employer in the industry.

Nevertheless, Plaintiffs argue that "[t]he extent and complexity of these linkages [between the talent agencies, studios, networks, and corporate parents] make it impracticable to confront and remedy the challenged hiring and referral practices without the presence of all Defendants. The Supreme Court itself has recognized as much in a context not at all dissimilar to that in which this case arises." Plaintiffs' Opp'n, at 55–56.

The Supreme Court decision to which Plaintiffs refer is *United States v. Mississippi*, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717 (1965), where the Supreme Court was faced with a complaint charging that the State of Mississippi and its election officials had, for 75 years, "been writing and adopting constitutional provisions, statutes, rules, and regulations, and have been engaging in discriminatory practices, all designed to keep the number of white voters at the highest possible figure and the number of colored voters at the lowest." *Id.* at 143, 85 S.Ct. at 816. The defendants joined were state election commissioners and county voting registrars who, acting in concert, drafted and administered "the various tests applied to [voting] applicants for registration [to vote]." *Id.* at 141, 85 S.Ct. at 815. The Court held that joinder of all defendants in one action was authorized by Rule 20(a), insofar as the complaint alleged facts showing that election officials acted and continued to act as part of a state-wide system designed to "deprive colored people the right to vote solely because of their color." *Id.* at 142, 85 S.Ct. at 815–16. In that case, and in the other voting rights case cited by Plaintiffs,[7] the various counties, agents and officials who carried out the state's agenda to depress or deprive individuals of their constitutional right to vote were joined.

Plaintiffs' attempt to analogize *U.S. v. Mississippi* with the present case is un-

---

7. *Dillard v. Crenshaw County,* 640 F.Supp. 1347 (M.D.Ala.1986).

persuasive. *Mississippi* involved a clear nexus between all of the discriminating individuals that justified joining all of the parties into a single case, namely, a state-wide discriminatory voting registration law that each county enforced as an instrumentality of the state. It is precisely this sort of uniform policy-maker—the State of Mississippi—that Plaintiffs are lacking in the present case.

In another non-employment case, *Nassau County Ass'n of Ins. Agents v. Aetna Life & Casualty Co.*, 497 F.2d 1151 (2d Cir.1974), the Second Circuit affirmed the district court's dismissal on the basis of misjoinder of an action joining 164 defendant insurers who allegedly terminated their relationships with plaintiff insurance agents for unlawful reasons. Despite the plaintiffs' allegations of identical wrongdoing by each defendant, the court found no right to relief arising from the same transaction or series of transactions, because the defendants' actions "were separate and unrelated, with terminations occurring at different times for different reasons with regard to different agents." *Id.* at 1154. Here, Plaintiffs' attempt to join all of the Employer and Agency Defendants is similar to the above case in that each Employer and Agency Defendant made hiring/representation decisions at different times, for different reasons, with regard to different individuals with different qualifications.

Plaintiffs attempt to side-step this clear obstacle to joinder by sub-dividing the Defendants. They claim that Agency Defendants control who is employed by Employer Defendants, Network Defendants control Studio Defendants, and Parent Defendants control their subsidiaries (or Subsidiary Defendants). Thus, *ipso facto,* every individual Defendant must defend itself against alleged discriminatory hiring decisions made by 50 other Defendants, over many of whom that individual Defen-

dant exercises absolutely no control. Plaintiffs' allegation that all Employer Defendants will consider only those individuals referred by Agency Defendants is undermined by Plaintiffs' own admission that some Plaintiffs have managed to secure employment and interviews through their own independent efforts. *See, e.g.,* FAC, at ¶¶ 153, 175, 263. Furthermore, even if, as Plaintiffs contend, networks participate in hiring decisions by virtue of licensing agreements with studios, nowhere do Plaintiffs contend that every studio has such an agreement with every network. Therefore, one network's agreement with one studio does not, by implication, satisfy the same transaction or occurrence requirement with respect to a completely separate network's agreement with a different studio. Simply lumping all networks into one group and all studios into another group does not make all of their actions interdependent. Similarly, while Plaintiffs may successfully argue that a parent company influences its own subsidiary, this does not imply that one parent company would influence a subsidiary of another parent company. Nevertheless, that is exactly what Plaintiffs are attempting to demonstrate as a justification for this joinder.

Despite Plaintiffs' attempt to obscure the underlying issue through charts and sub-divisions, there are no allegations of an actual concert of action among all of the Defendants to unite in a discriminatory hiring scheme. Plaintiffs' allegations that joinder is warranted merely because each Defendant's (or some sub-group of Defendants') autonomous hiring decisions, when taken together, comprise an industry-wide discriminatory practice, has no basis in law.

### b. Common Question of Law or Fact

Plaintiffs also fail to demonstrate that a common question of law or fact exists

among all of the many Defendants. While it is true that Plaintiffs have alleged claims against Defendants based on the same general theory of law, this is not a sufficient ground to find that their claims raise common legal or factual questions. *See Martinez v. Safeway Stores, Inc.,* 66 F.R.D. 446, 449 (N.D.Cal.1975); *Smith v. North Am. Rockwell Corp.,* 50 F.R.D. 515, 524 (N.D.Okla.1970); *accord Bailey v. Northern Trust Co.,* 196 F.R.D. 513, 517 (N.D.Ill.2000).

In the same vein as their failed showing of a same transaction or occurrence, Plaintiffs attempt to show that a common question exists as to all parties by virtue of an industry-wide hiring practice. Just as before, Plaintiffs have not identified a single authority where joinder was permitted on these grounds, and have not identified in the complaint a general oversight body—formal or informal—from where this industry-wide policy-making could have originated.

Thus, Plaintiffs have failed to satisfy the requirements for permissive joinder of Defendants under Rule 20(a).

### 2. Joinder of Plaintiffs

#### a. Class Action

■ In addition to permissive joinder (discussed further below), Plaintiffs attempt to combine their efforts through the process of a class action.[8] The class action format under the ADEA is not guided by Fed.R.Civ.P. 23, however. Instead, the ADEA, in 29 U.S.C. § 626(b), incorporates the standards of § 16(b) of the Fair Labor Standards Act (29 U.S.C. § 216(b)) and expressly authorizes employees to bring collective age discrimination actions "in be-half of themselves and other employees similarly situated." *Hoffman–La Roche v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989) (quoting § 216(b)); *see also Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 74, 120 S.Ct. 631, 641, 145 L.Ed.2d 522 (2000). In contrast to Fed.R.Civ.P. 23, which contains an "opt-out" provision, the FLSA contains an "opt-in" provision that prohibits any employee from being "a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

■ Therefore, in order for such an "opt-in" procedure—and the class action as a whole—to be permissible, the Court must determine whether Plaintiffs are similarly-situated to each other and to other individuals. "The relevant statutes and caselaw do not prescribe clear rules for determining whether putative class members are similarly situated. In general, however, courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination." *Sperling v. Hoffman–LaRoche, Inc.,* 118 F.R.D. 392, 407 (D.N.J.1988), *aff'd in part on other grounds and appeal dismissed in part on other grounds,* 862 F.2d 439 (3d Cir.1988), *aff'd and remanded on other grounds,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). "A determination of whether proposed class members are 'similarly situated' is a fact-specific one." *Pines v. State Farm Gen. Ins. Co.,* No. CV SA 89–631, 1992 WL 92398 at *7 (C.D.Cal. Feb.25, 1992).

---

8. Plaintiffs, in addition to seeking § 216(b) class action for their ADEA claims, also seek Rule 23 class action for all other claims, notably the LMRA and state law claims. However, in light of the Court's ruling on the ADEA class action, as well as its decision to dismiss the LMRA claims, the Court sees no reason to address the issue of Rule 23 class certification at this time.

 Recent circuit court decisions have held that the "similarly situated" requirement is more elastic and less stringent than that for joinder under Rule 20(a). *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir.2001) (quoting *Grayson v. K–Mart Corp.*, 79 F.3d 1086, 1095 (11th Cir.1996)). "[P]laintiffs bear the burden of demonstrating a reasonable basis for their claim of class-wide discrimination. The plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Hipp*, 252 F.3d at 1219.[9]

 In making the determination of whether plaintiffs are "similarly situated," various approaches have been suggested. *See Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095, 1102–03 (10th Cir. 2001) (discussing three possible approaches to the "similarly situated" analysis). However, it appears that the majority of courts prefer the *ad hoc,* two-tiered approach, as described in *Mooney v. Aramco Servs. Co.*, supra, and *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987).[10] *See, e.g., Hipp*, 252 F.3d at 1218–19 ("The two-tiered approach to certification of § 216(b) opt-in classes ... appears to be an effective tool for district courts to use in managing these often complex cases, and we suggest that district courts in this circuit adopt it in future cases."); *Bayles v. American Med. Response of Colo., Inc.*, 950 F.Supp. 1053, 1067 (D.Colo. 1996) ("To the extent that [different approaches yield different results], I would apply the *Lusardi* approach, which affords flexibility in weighing concerns for judicial economy against unfair prejudice to a defendant tempered by the remedial purposes of the FLSA.").

Under this approach, the district court makes two determinations, on an *ad hoc,* case-by-case basis. At the first determination, called the "notice stage," the court makes a decision based on the pleadings and any affidavits that have been submitted, as to whether the class should be certified. Due to the minimal evidence at the court's disposal, this determination is made based on a fairly lenient standard, and typically results in a "conditional certification" of a representative class. *Mooney,* 54 F.3d at 1213–14. The second determination is made after discovery is largely complete, usually on a motion for decertification by the defendant. There, the court weighs various factors in making a factual determination as to whether the plaintiffs are similarly situated. *Id.*

In *Lusardi,* an ADEA class action was brought against the defendant in connection with various work force reductions. While noting the lack of authority on the

---

9. The Court recognizes that most of the cases that have denied 29 U.S.C. § 216(b) class certification have done so at a stage further along in the proceedings than the current Rule 12(b)(6) motion before this Court, because of the limited evidence required of Plaintiffs at this time. However, this case is somewhat unique, in that Plaintiffs are seeking to certify a class against a group of Defendants that this Court has just determined to be improperly joined. Therefore, the Court will proceed with its analysis of Plaintiffs' proposed class as it is presently stated in the complaint—that is, against a disparate group of Defendants. However, as noted below, this discussion is not meant to imply that Plaintiffs could not proceed with a class action against a single employer or related group of employers, particularly in light of the lenient standards applied at this stage of the proceeding.

10. *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987), *mandamus granted in part, appeal dismissed,* 855 F.2d 1062 (3d Cir.1988), *vacated in part, modified in part, and remanded,* 122 F.R.D. 463 (D.N.J.1988), *aff'd in part, appeal dismissed,* 975 F.2d 964 (3d Cir.1992).

subject of similarly-situated plaintiffs, the court recognized that the only similarities between the plaintiffs were that they were all present or former employees of Xerox, and were all alleging violations of the ADEA. *Lusardi,* 118 F.R.D. at 359. Thus, the court concluded that the class should be decertified because of, among other reasons, (1) the disparate factual and employment settings of the individual plaintiffs, (2) the various defenses available to the defendant which appeared to be individual to each plaintiff, and (3) fairness and procedural considerations. *Id.*

In *Stone v. First Union Corp.,* 203 F.R.D. 532, 542–43 (S.D.Fla.2001), the court reviewed the factors used in various cases utilizing the two-tiered system. In *Grayson* and *Hipp,* the following factors were used: (1) whether the plaintiffs all held the same job titles; (2) whether the plaintiffs worked in different geographical locations; (3) the extent to which the claimed discrimination occurs during different time periods and by different decision-makers; (4) whether plaintiffs have provided "statistically significant" evidence of age discrimination; (5) whether the plaintiffs all alleged similar, though not identical, discriminatory treatment; (6) whether the plaintiffs have sufficiently pled and supported by affidavits, depositions, and the like that defendant's decision-makers have articulated and manifested a clear intent to purge the defendant of older employees; and (7) whether the defendant took steps to implement its plan, such as by targeting older employees for criticism and building a "paper trail" that would be grounds for their demotion.

In examining the facts of *Stone,* the court made these observations:

The proposed opt-in class mixes employees with different job titles and from all levels of the organization; includes individuals employed within different divisions of the bank; includes individuals who assert a variety of claims, many of which have not been asserted by the representative Plaintiff; and fails to provide evidence of the application of an overriding discriminatory policy, practice, or procedure. Taken as a whole, the factors set forth above ... weigh heavily in favor of decertifying the subject class.

*Stone,* 203 F.R.D. at 543.

In *Hyman v. First Union Corp.,* 982 F.Supp. 1 (D.D.C.1997), the court looked at the following factors in its decision to certify the class: (1) the alleged activities of the defendant; (2) the similarities among the members of the proposed collective action; and (3) the extent to which members of the proposed action will rely on common evidence to prove the alleged discrimination. *Id.* at 3–5.

Before analyzing the present case under the standards set forth in the cases cited above (while keeping in mind the early stage of this proceeding), two significant differences must be recognized. First, all of the above cases involve a common employer. As mentioned several times previously, Plaintiffs in this case are instead attempting an unprecedented move of combining the decisions of several loosely-related entities, under an umbrella of a common industry-wide practice. Second, Plaintiffs in this case are attempting to proceed under a "pattern-or-practice" claim, not an individualized discrimination claim.

The recent decision in *Thiessen v. General Electric Capital Corp.,* supra, recognized this important distinction. "[T]he order and allocation of proof, as well as the overall nature of the trial proceedings, in a pattern-or-practice case differ dramatically from a case involving only individual claims of discrimination." *Id.,* 267 F.3d at 1106. In its decision to decertify the class,

the district court looked at the following factors in the second stage of the two-tiered approach: (1) whether a sufficient link existed between the alleged discriminatory policy and the challenged employment decisions; (2) whether individual issues would predominate at trial; and (3) whether a trial of the action could be coherently managed and evidence presented in a manner that would not confuse the jury or unduly prejudice any party. *Id.* at 1103.

The Tenth Circuit found that the district court's failure to account for the pattern-or-practice nature of the plaintiffs' claim, when analyzing the claim under the above factors, amounted to an abuse of discretion. Although plaintiffs in that case may not have been "similarly situated" under a typical discrimination claim, they were "similarly situated" under a "pattern-or-practice" claim. *Id.* at 1107–08. Nevertheless, the court concluded, "We do not hold that whenever there is evidence of a pattern-or-practice, a class must be certified. Whether certification or decertification is appropriate depends upon application of the factors we have identified in the ad hoc approach." *Id.* at 1108.

In light of this Court's decision not to allow joinder of the various Defendants, it becomes difficult to analyze properly the efficacy of Plaintiffs' class certification. Given the lenient burden at the current "notice" stage, it would appear that Plaintiffs have done all that is required of them up to this point. Were they to proceed in a class action against any one employer, under a "pattern-or-practice" claim against that particular employer, the class would most likely be conditionally certified at this point, or at some point later in the proceedings. However, Plaintiffs have not chosen to state a claim challenging the employment practices of any one particular employer (or talent agency), but instead have chosen to pursue an industry-wide discrimination claim against each employer. Under that mechanism, this Court can see no basis for the Plaintiffs' class being certified. Even looking at the above factors in light of the minimal evidence presented at this stage, such a claim cannot, in the interests of fairness and justice, be allowed to proceed.

In the present case, the only similarities among the Plaintiffs are that they are all (1) writers, and (2) over the age of forty. Their individual skills, work experience, and relationships to the proposed Defendants are completely varied among them. Moreover, Plaintiffs have not sufficiently alleged any common decision-maker among the many hiring bodies, much less have they alleged sufficient factual support for their claim of an industry-wide policy of discrimination. Thus, examining this case in light of the factors suggested in *Thiessen*—the most recent case to deal with this issue—Plaintiffs cannot satisfy the requirements for class certification.

First, regarding the link between the policy and the employment decisions, even if Plaintiffs can alleged facts sufficient to allow the inference that the industry as a whole has been engaging in ageist practices, that would still not create a link nor have an impact on any one individual Defendant. Plaintiffs must allege facts sufficient to allow the inference that the individual Defendant being accused of a pattern-or-practice of age discrimination has itself engaged in ageist practices. There is no legal basis under which the discriminatory practice of one employer will be imputed on another, simply because they are involved in a common industry.

Second, were this case to proceed as Plaintiffs suggest, with a class of Plaintiffs and joinder of Defendants, individualized issues would certainly predominate at trial.

Pattern-or-practice cases are generally held in two stages: the first stage deals with whether a discriminatory policy exists, and the second stage deals with how that policy affected individual plaintiffs. *See Teamsters*, 431 U.S. at 360–61, 97 S.Ct. at 1867–68. At the first stage, individualized issues would be present in the form of numerous defenses that may be asserted by the multitude of defendants—employers and talent agencies alike—that have minimal, if any, connection with one another. At the second stage, individualized issues would abound, considering the Court would be faced with the potential of over 2500 different hiring decisions.

Finally, given the circumstances of this case, it would be nearly impossible for such an action to be "coherently managed and evidence presented in a manner that would not confuse the jury or unduly prejudice any party." *Thiessen*, 267 F.3d at 1103. By the very nature of their claim, Plaintiffs seek to ascribe liability on one Defendant for the alleged discriminatory practices of every other Defendant. Such an attempt is highly prejudicial to each Defendant, not to mention the confusion that such a presentation would surely create for the jury at trial.

Furthermore, as recognized in *Pines v. State Farm Gen. Ins. Co.*, supra, a case in which the proposed class consisted of employee applicants, as in the present case, the court decided that those who were deterred from applying were not similarly situated to those who had applied and were rejected. *Id.*, 1992 WL 92398 at *11. In the instant case, each Plaintiff had allegedly applied to and was allegedly deterred from applying to a different set of Defendants than every other Plaintiff. Thus, no individual Plaintiff can be deemed "similarly situated" to any other individual Plaintiff, other than by virtue of the fact that they are all alleging a violation of the

ADEA. That, by itself, is not enough to satisfy even the meager requirements at this stage for similarly-situated plaintiffs to pursue a class action under § 216(b).

In light of the above authority, and the facts of this case, this Court finds that the set of Plaintiffs in this action should not be certified as a class.

### b. Rule 20(a) Joinder

▮▮▮ Plaintiffs also contend that they can be joined under the rules of permissive joinder. Plaintiffs argue that their claims are "logically related" because they are all victims of the same industry-wide "pattern or practice" of discrimination. However, it is undisputed that the individual Plaintiffs are all alleging a different factual basis for how that alleged discrimination affected each of them. It is also undisputed that many Plaintiffs have never even applied for employment or representation with most of the Employer Defendants or Agency Defendants.

Plaintiffs cite *Alexander v. Fulton County*, 207 F.3d 1303 (11th Cir.2000) for the proposition that an allegation of a pattern of age-based discrimination satisfies the transactional relatedness requirement despite the differences in the factual underpinnings of the Plaintiffs' respective claims. In *Alexander*, the plaintiffs alleged that "they were subject to a systemic pattern or practice of race-based discrimination ..." *Id.* at 1324. The court, applying an abuse of discretion standard, affirmed joinder of 18 sheriff's deputies where it was uncontroverted that "[p]laintiffs all seek relief based on the same series of discriminatory transactions by the same decision maker in the same department during the same short time frame." *Id.* Therefore, Plaintiffs' reliance on *Alexander* for the conclusion that pattern-or-practice allegations render joinder of Plaintiffs proper "regardless of factual

differences among the plaintiffs and their injuries" is an incorrect reading of that case. Plaintiffs' Opp'n, at 51. In the present case, rather than alleging that the same decision-maker discriminated against Plaintiffs over a short time frame, Plaintiffs have alleged that over the last twenty years, multiple decision-makers employed by multiple Defendants have discriminated against multiple Plaintiffs.

Plaintiffs also cite *Puricelli v. CNA Ins. Co.*, supra, for their position that pattern-or-practice allegations are sufficient for joinder. In *Puricelli*, the court recognized that whether plaintiffs' claims constitute a "single transaction or occurrence" is determined on a case-by-case basis. *Id.*, 185 F.R.D. at 142. In that case, the court allowed joinder of two plaintiffs against a single defendant where the plaintiffs' complaint alleged that both were "subjected to a similar method of removal from their pre-takeover positions through performance evaluations, performed by ... Mr. Romer, during the same period, and left the employ of CNA within one month of each other." *Id.* In the instant case, regarding Plaintiffs' allegations against each separate Defendant, it is unrefuted that there were multiple decision-makers employed by *each* Defendant, and that the decisions spanned a twenty-year timeframe.

Plaintiffs cite several other cases to support their position, however each of these cases featured a single, common decision-maker as well. *See Gorence v. Eagle Food Ctrs., Inc.*, No. 93–C4862, 1996 WL 734955 at *4 (N.D.Ill.Dec.19, 1996) (observing that although plaintiffs worked at different facilities of same employer, a common decision-maker [Mr. Barber] was the "logical link" between their claims); *Blesedell v. Mobil Oil Co.*, 708 F.Supp. 1408, 1421–22 (S.D.N.Y.1989) (concluding that joinder was proper because all plaintiffs complained of sexual discrimination by the same supervisor during the same time period); *King v. Pepsi Cola Metro. Bottling Co.*, 86 F.R.D. 4, 6 (E.D.Pa.1979) (holding joinder proper where all plaintiffs worked in the same unit and were under the supervision of the same supervisor who allegedly "played an integral role in carrying out the alleged discriminatory company policy").

In contrast, in *Grayson v. K–Mart Corp.*, 849 F.Supp. 785 (N.D.Ga.1994),[11] 11 former store managers alleged that they each were demoted pursuant to a company-wide pattern and practice of age discrimination, and argued that their statistical and anecdotal evidence demonstrated a "hostile corporate culture" for all older store managers, which should permit joinder. *Id.* at 788. The court rejected the plaintiffs' argument and severed their claims, explaining that each hiring decision is a separate action:

"Plaintiffs' reliance on defendant's alleged general bias toward store manag-

11. Plaintiffs argue that *Grayson* was effectively overruled by the Eleventh Circuit in *Grayson v. K Mart Corp.*, 79 F.3d 1086, supra. Plaintiffs are incorrect. In *Grayson*, 79 F.3d 1086, the court affirmed a decision in a related case involving the same plaintiffs, in which the district court allowed the creation of an opt-in class under § 216(b). The circuit court did not rule on the appeal of the district court's decision in *Grayson*, 849 F.Supp. 785, because that case was eventually dismissed without prejudice and thus was a non-final, non-appealable order. 79 F.3d at 1090–91. However, the court noted that one court could allow an opt-in class under § 216(b), and another court in same situation could deny joinder under Rule 20(a), "because, among other things, the standard for allowing an opt-in joinder class under 216(b) differs from, and is more lenient than, the standards for joinder and severance under Rules 20(a) and 42(b) ..." *Id.* at 1097. Therefore, the decision in *Grayson*, 849 F.Supp. 785, remains intact.

ers over forty to support joinder of their case is misplaced, as litigation of even any purported general policy of defendant, as it might affect each plaintiff here, would inevitably focus in detail on the separate work histories of each plaintiff.... While all of these [demotion] decisions may not be completely unrelated, in that they were made during the same time period and in response to the immense competitive pressures being felt by K Mart at the time, they hardly constitute a single action on the part of the defendant."

*Id.* at 788. *See also Smith v. North Am. Rockwell Corp.,* 50 F.R.D. at 522 (finding severance proper in a discrimination case because the claims of the plaintiffs, who worked for the defendant in different capacities and departments, did not arise out of the same transaction or occurrence); *Buie v. Experian Information Solutions, Inc.,* No. 98–C1521, 1998 WL 729614 at *5 (N.D.Ill. Oct.16, 1998) (finding that an alleged pattern and practice of race discrimination in promotions, and systemic failure to comply with EEO policy, did not establish that the plaintiffs' claims arose from the same or series of transactions, as each promotion decision involved separate decision-makers, departments and time periods).

In *Byers v. Illinois State Police,* No. 99–C8105, 2000 WL 1808558 (N.D.Ill.Dec.6, 2000), the court provided a summary of the joinder analysis in discrimination cases, including pattern-or-practice cases. After surveying a number of cases (including many cited by parties in this case), the court stated:

> A summary of these cases indicates that in causes of action involving discrimination, Title VII or otherwise, courts look to whether the discrimination took place at roughly the same time, if it involved the same people, whether there is a relationship between the discriminatory action, whether the discriminatory action involved the same supervisor or occurred within the same department, and whether there is a geographic proximity between the discriminatory actions.... On the other hand, ... allegations of a common discriminatory policy or practice, or a company-wide policy of discrimination, could tilt the balance in favor of joinder despite those other factors which might favor severance.

*Id.* at *4.

Plaintiffs' pattern-or-practice claims are being directed at the entire television industry over a twenty-year period, rather than at individual Defendants. With respect to the individual Defendants, Plaintiffs' allege a general discriminatory practice, but offer few factual allegations in support of these claims,[12] and present no allegations of a decision-maker common to each Defendant.

Furthermore, with respect to Agency Defendants, certain Defendants have had practically no individualized allegations made against them in the complaint. Moreover, Plaintiffs have actually alleged facts showing the absence of discrimination with respect to certain Agency Defendants. For example, according to the complaint, over one-quarter of the Plaintiffs have acknowledged that after turning forty they have in fact *been represented* by certain specified Agency Defendants. *See* FAC, at ¶¶ 86, 90, 106, 115, 118, 137, 155, 160, 170, 183, 197, 249, 258.

12. For example, with respect to Defendant Universal, Plaintiffs allege that "[d]uring the 1997/98 broadcast season, only 42 percent of the writers employed by the Universal Defendants to write for shows broadcast on prime time television were over the age of forty." FAC, at ¶ 307. This is the entire individualized allegation in support of a claim against this Defendant. With nothing more, a showing that over forty percent of the relevant workforce is comprised of the suspect class does not create a viable cause of action for a pattern-or-practice of discrimination.

The Ninth Circuit's decision in *Bautista v. Los Angeles County,* 216 F.3d 837 (9th Cir.2000), although it discusses the scope of the transaction and occurrence standard in the context of Fed.R.Civ.P. 8 rather than Fed.R.Civ.P. 20, is instructive. In *Bautista,* an employment discrimination case brought under the FEHA (Cal. Gov't Code § 12940), R.A. Music took over the operations of Family Restaurants in the Los Angeles Music Center. The complaint alleged that the fifty-one named plaintiffs had been employees of Family Restaurants, but were denied employment by R.A. Music based upon their race, age and disability.

Despite the fact that all plaintiffs were simultaneously fired as a result of the acquisition and subsequent change of control, the Ninth Circuit found that the claims did not arise out of the same transactions and occurrence. The court reasoned that

> [w]hile the complaint contains stray allegations of discriminatory policies or practices imposed by R.A. Music, what it seeks is individual relief for each of the plaintiffs. Each plaintiff's right to relief therefore depends upon proof of the operative facts giving rise to an enforceable right in favor of that plaintiff. The [race, age, and disability discrimination] claims alleged in the complaint do not meet that test; they are hybrids that qualify neither as class action allegations nor as statements of individual claims.... [E]ach plaintiff's claim being founded upon a separate transaction or occurrence, it is properly stated in a separate count.

*Id.* at 840. "Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice." *Id.* at 841 (citation omitted).

Therefore, under the standards and guidelines of permissive joinder, Plaintiffs have not properly alleged claims particular to each individual Defendant to satisfy the same transaction or occurrence requirement. Plaintiffs should not be joined for the purpose of pursuing a claim against any individual Defendant, based on their complaint as it is presently constituted.

### 3. Discretionary Severance

 However, even if Plaintiffs could somehow meet the minimum legal requirements for joinder, this Court would then exercise its discretion under Rule 20(b), Rule 21, and Rule 42(b) to sever for at least two reasons: (1) to prevent jury confusion and judicial inefficiency, and (2) to prevent unfair prejudice to the Employer and Agency Defendants. *See Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1296 (9th Cir.2000).

Instead of making the resolution of this case more efficient, because of the multitude of isolated agreements and decision-makers and corporate families that Plaintiffs are alleging in this case, joinder would instead confuse and complicate the issues for all parties involved. In *Coleman,* the Ninth Circuit affirmed severance in an ADEA case brought by ten plaintiffs against Quaker Oats because it would have resulted in jury confusion: "For each plaintiff, the jury would have had to examine individually his or her employment history as well as the explanations given by Quaker for not retaining him or her, explanations that would require the testimony of each employee's supervisors and raters." *Id. See also Henderson v. AT & T Corp.,* 918 F.Supp. 1059, 1063 (S.D.Tex. 1996) ("[E]ven assuming there is a pattern and practice of discrimination within the [upper management group], it is clear that

the Plaintiff's claims in fact are highly individualized, involving particularized questions about each Plaintiff's work history and job performance. Clearly, trying the claims in one action would be extraordinarily confusing for the jury, requiring the jury to keep separate more than twenty claims of five Plaintiffs. A single trial would present the jury with the hopeless task of trying to discern who did and said what to whom and for what reason." (internal quotation omitted)). *But cf. Coughlin v. Rogers,* 130 F.3d 1348, 1350–51 (9th Cir.1997) (finding, under an abuse of discretion standard, that multiple plaintiffs' allegations against the INS did not support joinder, because there may be numerous reasons for the defendant's conduct with respect to each plaintiff. However, if plaintiffs' had been alleging a pattern or policy of wrongful behavior *within the same organization,* joinder may have been justified).

Severance is also appropriate here for the more compelling reason of preventing unfair prejudice to Defendants that would inevitably result if all of Plaintiffs' claims were litigated in one lawsuit. As the case is currently configured, there is a substantial risk that one Employer or Agency Defendant will be tainted by the alleged misdeeds of another, unfairly resulting in guilt by association. *See Sidari v. Orleans County,* 174 F.R.D. 275, 282 (W.D.N.Y. 1996) (prohibiting the consolidation of cases involving separate defendants where plaintiffs were "asserting that the defendants' combined conduct has created a 'hostile work atmosphere.' ... A lumping together of such claims, which amounts to guilt by association, would unfairly prejudice the defendants."). In *Coleman,* the Ninth Circuit held that "[t]he district court properly considered the potential prejudice to [the defendant] created by the parade of terminated employees and the possibility of factual and legal confusion on the part

of the jury." *Id.,* 232 F.3d at 1297. The Ninth Circuit also agreed that "even the strongest jury instructions could not have dulled the impact of a parade of witnesses, each recounting his contention that defendant laid him off because of his age." *Id.* at 1296 (quoting *Moorhouse v. Boeing Co.,* 501 F.Supp. 390, 393 n. 4 (E.D.Pa.1980), *aff'd,* 639 F.2d 774 (3d Cir.1980)).

Here, the danger of unfair prejudice is even greater. In this case, it is not simply the risk of prejudice that may result when evidence of one hiring decision taints how another hiring decision within the same company is viewed by the jury, but the risk that a decision by one company might taint the jury's view of another decision made by a different company. If this case is allowed to proceed as structured by Plaintiffs, it would result in a panoply of accusations against individual employers and talent agencies that would be imputed on each of their unaffiliated competitors in the industry.

In fact, if Plaintiffs' complaint is any indication, their intention is precisely to use alleged ageist remarks from one employer to inculpate employers who made no such remarks, which is exactly the type of conduct that warrants severance. *See, e.g.,* FAC, at ¶¶ 7–8. However, in Plaintiffs' surreply brief, they contend that they do not intend to hold individual Defendants responsible for the discriminatory acts of another. Instead, they intend to show that each Employer Defendant adopted and maintained its own company-wide policy of age discrimination. Plaintiffs' Surreply Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss and to Sever ("Plaintiffs' Surreply"), at 11. If that is the case, then, once again, there is no reason why this case should not proceed against each Defendant separately, instead of risking the inherent prejudice that would arise

from forcing all Defendants to participate jointly. Furthermore, there is also no reason, as Plaintiffs' suggest, to wait until trial to sever these claims. Seeing as Plaintiffs must prove all Defendants maintained separate company-wide discriminatory policies, there is no compelling justification why all Defendants must continue to collectively defend against Plaintiffs allegations from this point forward.

Nevertheless, Plaintiffs argue that this Court should not consider any alleged prejudice to Defendants from being held accountable for the others' alleged wrongs because "concurrent wrongdoers may be held jointly and severally liable when they contribute to a single, indivisible injury [and this 'principle'] is deeply embedded in the common law." Plaintiffs' Opp'n, at 53. Plaintiffs further assert that the fact that "all Defendants have, by virtue of their participation in an industry-wide practice of discrimination, contributed to a single, indivisible injury seals the relationship between the claims ..." Plaintiffs' Opp'n, at 54.

However, as discussed in detail below, because Plaintiffs cannot hold Defendants jointly and severally liable in this manner under the ADEA, the FEHA, and the NYHRL, Plaintiffs have lumped together claims in a fashion that would unfairly prejudice Defendants and amount to guilt by association. Even if Plaintiffs could hold Defendants jointly and severally liable, the appropriateness of joinder is within the court's discretion. *See Boyd v. Diebold, Inc.,* 97 F.R.D. 720, 722 (E.D.Mich. 1983) (parties who are jointly and severally liable are not indispensable parties or necessary parties to an action against one of them merely because of the joint and several liability); *Jones Knitting Corp. v. A.M. Pullen & Co.,* 50 F.R.D. 311, 315 (S.D.N.Y.1970).

The Court acknowledges that Plaintiffs are asserting pattern-or-practice claims against Defendants, rather than the more traditional individualized discrimination claims. Nevertheless, merely asserting such a claim does not give Plaintiffs carte blanche to pool every employer and talent agency in an industry together under an umbrella of "industry-wide discrimination," particularly when Plaintiffs have made no substantive allegations of any commonality among all of the decision/policy-makers in this diverse group of defendants. Furthermore, as discussed below, Plaintiffs' statistical contentions would not likely satisfy even basic prima facie requirements with respect to any individual Defendant, much less the industry as a whole, were the Court to definitively rule on that issue at this time. Thus, the Court is well within its discretion to sever the Defendants in this action, and direct Plaintiffs to make a claim—if they so desire—of a pattern-or-practice of discrimination with respect to a particular employer or *related* group of employers.

### 4. Conclusion

 Therefore, because Plaintiffs failed to show that the requirements of Fed.R.Civ.P. 20(a) have been satisfied, and based upon the Court's discretion, the Court finds that joinder of all Plaintiffs against all Defendants is improper. As indicated above, this decision does not preclude Plaintiffs from filing a claim against individual employers alleging proper grounds for discrimination by that employer. However, the complaint, as it is presently constituted, is not sufficient to allow for any Plaintiff, or all Plaintiffs, to proceed against any one Defendant.[13] The Court, therefore, dismisses the ADEA, FEHA, and NYHRL discrimination claims

---

**13.** Pursuant to Fed.R.Civ.P. 12(b)(6), a complaint must allege "specific wrongdoing" suf-

ficient to state a claim for relief. *See Johnson v. Reagan,* 524 F.2d 1123, 1124 (9th Cir.

by all Plaintiffs against all individual Defendants without prejudice and with leave to amend.

## C. JOINT AND SEVERAL LIABILITY

█ Plaintiffs' final attempt at satisfying the requirements of permissive joinder is the allegation that Plaintiffs suffered an "indivisible" emotional injury by being discouraged from applying for a job because of the alleged "industry-wide" discrimination. Again, Plaintiffs fail to bring relevant authority to this Court's attention in support of this theory and on how it compels joinder.[14]

Plaintiffs contend that a substantial percentage of the television/entertainment in-

---

1975). All allegations of material fact are construed in the light most favorable to the nonmoving party. *See Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 248 (9th Cir. 1997). When considering a motion to dismiss, however, the Court need not accept as true conclusory allegations or legal characterizations. Nor need it accept unreasonable inferences or unwarranted deductions of fact. *See Transphase Systems, Inc. v. Southern California Edison Co.*, 839 F.Supp. 711, 718 (C.D.Cal.1993). Nor need a court assume that plaintiff can prove facts different from those it has alleged. *See Associated Gen. Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983).

Here, assuming the facts that Plaintiffs allege in their complaint to be true, they have not adequately pled a prima facie case against any one individual Defendant. *See Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 875–76, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984) ("Proving isolated or sporadic discriminatory acts by the employer is insufficient to establish a prima facie case of a pattern or practice of discrimination; rather it must be established by a preponderance of the evidence that ... 'discrimination was the company's standard operating procedure—the regular rather than the unusual practice.' "). In fact, Plaintiff Tracy Keenan Wynn, the first named Plaintiff, has not even specifically alleged to have applied, or been deterred from applying, to work for Defendant NBC, the first named Defendant. Such deficiencies in the pleadings will not allow this action to proceed based on the complaint in its present form.

14. The cases cited by Plaintiffs do not support their assertion that there is an "injury to all plaintiffs" which is "indivisible," and therefore joinder of all employers and talent agencies in the television industry is warranted. Plaintiffs' Opp'n, at 52. Plaintiffs cite *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1293–95 (8th Cir.1997), a case dealing with mental anguish exclusively under Minnesota law, and having nothing to do with joinder, and therefore having no application to this case. Nevertheless, that case held that it is the defendant's burden to show that a damage award should be apportioned in connection with a plaintiff's pre-existing mental condition. That situation is not relevant to the present case. The court also acknowledged that joint and several liability exists when "two or more persons acting independently cause harm to a third person through consecutive acts of negligence ..." *Id.* at 1293 n. 9. Plaintiffs are not asserting any claim of negligence in this case, so that statement cannot support the joint and several liability claim that Plaintiffs' seek to enforce here.

Plaintiffs also cite *Moffett v. Gene B. Glick Co.*, 621 F.Supp. 244 (N.D.Ind.1985), in which the plaintiff sued two supervisors and her employer for sexual harassment. Plaintiff in that case settled before trial with the two supervisors for $50,000, and was later awarded damages at trial against the employer defendant for her emotional injuries in the amount of $66,640.00. Since her emotional distress injury was "indivisible," the award was reduced by the $50,000 settlement. *Id.* at 289–90. Once again, the court never even addressed the issue of joinder because it was not raised. There was no apportionment of damages among the wrongdoers because there was no such argument presented.

*Browning–Ferris Indus. of Ill. v. Ter Maat*, 195 F.3d 953 (7th Cir.1999) and *Northington v. Marin*, 102 F.3d 1564 (10th Cir.1996), two other cases cited by Plaintiffs, are equally inapposite. In *Browning–Ferris*, a case involving the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), the court expressly stated that CERCLA modifies the common law rule of

dustry is liable for each other's alleged discrimination against older writers. Specifically, they allege:

> [E]ach of the Defendants has engaged in a company-wide practice of discrimination that is an inextricable component of an industry-wide pattern. As a consequence of this cumulative pattern, Plaintiffs have been injured in a manner that is not divisible. Inasmuch as Defendants have contributed to the injury by participating in the industry-wide practice, they are all jointly and severally liable.

Plaintiffs' Opp'n, at 53; *see also* FAC, at ¶¶ 14–16.

Plaintiffs allege that the indivisible injury is really both an indivisible emotional injury (discouragement) [15] and an indivisible economic injury. The emotional injury is described as "a singular and indivisible emotional injury that disables them from enduring additional rebuffs from any or all of the Defendants." Plaintiffs' Opp'n, at 54. The economic injury is described as "lost employment opportunities as a result of Defendants' uniform adherence to ageist practices through a common hiring process." Plaintiffs' Opp'n, at 55.

The Employer Defendants liken Plaintiffs' joint and several liability theory to the following situation: If Studio A refuses to hire Writer X on the basis of his age, Studios B and C should be held financially responsible to Writer X for a decision over which they could not possibly have had any control. Plaintiffs' theory extends to the Agency Defendants as well. If Talent Agency D failed to represent Writer X for an impermissible reason, Talent Agency E (and Studios A, B, and C) should be held jointly and severally liable for this failure.

Aside from having no precedential authority, this joint and several liability theory fails for primarily two reasons. First, there is no cognizable theory under the ADEA, the FEHA, or the NYHRL upon which one employer can be held jointly and severally liable for the discriminatory practices of another, without an alleged relationship between the two employers. Second, because such an "industry-wide" practice of discrimination is not actionable as set forth in this case, Plaintiffs' alleged injuries do not subject Defendants to joint and several liability.

### 1. Joint and Several Liability in the ADEA, the FEHA, and the NYHRL

■ Plaintiffs' attempt to impose joint and several liability on Defendants defies

---

joint and several liability to allow one liable party to sue another for contribution. When contribution is sought from multiple parties, whether those parties can be held jointly liable under CERCLA, however, is not guaranteed by the statute. "It is up to the district judge, guided only by equitable considerations—a broad and loose standard ..." *Id.*, 195 F.3d at 957. Similarly, *Northington* also discussed joint liability, but did so in the context of 42 U.S.C. § 1983, not Title VII or the ADEA. While acknowledging that § 1983 actions incorporate common law notions of joint and several liability, the court also noted that "[i]t is not essential that all persons who concurrently caused the harm be joined as defendants." *Id.*, 102 F.3d at 1569. While these cases could arguably support a joint and

several liability theory under other statutes and circumstances, they are unrelated to Plaintiffs' theory of "industry-wide" discrimination in this case, and do not otherwise imply that joinder of parties is necessary.

**15.** Plaintiffs' use of the term "discouragement" is distinct from the concept of a "deterred applicant" discussed in Section III.D. The discouragement alleged here is a form of collective emotional injury that exists as a result of the alleged discriminatory practices. In contrast, as discussed in Section III.D., Plaintiffs argue that because they were "deterred applicants" this constitutes injury-in-fact and thus satisfies their pleading burden.

the express language of the ADEA. The ADEA provides: "It shall be unlawful for an employer (1) to fail or refuse to hire or to discharge any individual ... because of such individual's age." 29 U.S.C. § 623(a). Therefore, only the employer that failed to hire the individual—not all employers in the industry—can be held liable under the ADEA. The only exceptions under the ADEA where an entity may be liable for another entity's discriminatory refusal to hire is when (1) the entities can be considered a "single employer" or "integrated enterprise," (2) the entities can be considered "joint employers," or (3) the discriminating entity is the agent of the other entity. *See Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 993 (6th Cir.1997); *Morgan v. Safeway Stores, Inc.,* 884 F.2d 1211, 1213–14 (9th Cir.1989); *Childs v. Local 18, Int'l Brotherhood of Electric Workers,* 719 F.2d 1379, 1382–83 (9th Cir.1983).

The scope of "employer" liability is the same under the ADEA, the FEHA, and the NYHRL. *See* Cal. Gov't Code § 12926(d) (defining employer in terms similar to the ADEA definition in 29 U.S.C. § 630(b)); N.Y. Exec. Law § 296(1)(a) (describing employer liability in terms similar to the those in the ADEA) (29 U.S.C. § 623(a)); *Muzquiz v. City of Emeryville,* 79 Cal.App.4th 1106, 1115–16, 94 Cal.Rptr.2d 579 (2000) (recognizing that California antidiscrimination laws are interpreted in accordance with analogous federal law); *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992) (stating that interpretation of New York's HRL should rely upon the ADEA and Title VII). Therefore, while this discussion focuses primarily on the ADEA, it applies to the FEHA and NYHRL components of the cause of action as well.

### a. Single Employer

██ Courts consider four factors in determining whether two or more separate business entities may be treated as a "single employer" under the employment discrimination statutes: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common financial control. *See Herman v. United Brotherhood of Carpenters and Joiners of America, Local No. 971,* 60 F.3d 1375, 1383–84 (9th Cir.1995) (holding that an international union and its local chapters were not a single employer subject to joint liability under the ADEA); *Morgan,* 884 F.2d at 1213–14 (finding that an employer and credit union were not a single employer for purposes of Title VII because there existed no central control of labor relations); *Laird v. Capital Cities/ABC, Inc.,* 68 Cal.App.4th 727, 737–41, 80 Cal. Rptr.2d 454 (1998) (applying the above four-factor test, the court held that a parent and wholly-owned subsidary were not a single employer under the FEHA). It is clear that all Employer and Agency Defendants are not a single employer, nor do Plaintiffs make this contention.

### b. Joint Employers

██ Defendants are not joint employers. Two or more employers may be considered "joint employers" if both employers control the terms and conditions of employment of the employee. *Swallows,* 128 F.3d at 993 n. 4 (citing *NLRB v. Browning–Ferris Indus. of Pa.,* 691 F.2d 1117, 1123 (3d Cir.1982)). In determining whether the two employing entities may be considered "joint employers," the following factors have been considered: (1) the nature and degree of control over the employees; (2) day-to-day supervision, including discipline; (3) authority to hire and fire the employee and set conditions of employment; (4) power to control pay rates or methods of payment; (5) control of the employee records, including payroll. *See*

*Torres–Lopez v. May,* 111 F.3d 633, 639–40 (9th Cir.1997). Once again, Plaintiffs have not alleged that Defendants have any authority to control, supervise, hire and fire, discipline, pay or keep employee records for each other's employees.

### c. Agency

 Under the ADEA, an employer may be liable for the acts of its agents. *See* 29 U.S.C. § 630(b). Agency is a fiduciary relationship arising when one individual or entity consents to allow another individual or entity to act on its behalf and subject to its control. *See Childs,* 719 F.2d at 1382–83. The Ninth Circuit has stated that the "obvious purpose" of agency liability in Title VII and the ADEA was to "incorporate respondeat superior liability into the statute." *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587 (9th Cir.1993). Plaintiffs have not alleged that all Employer Defendants were acting under the authority and on behalf of other Employer Defendants. In fact, considering most of the Employer Defendants are competitors, such an allegation would not be credible even if made. Plaintiffs have also made no allegations that any specific Agency Defendant acted on behalf and subject to the control of any specific Employer Defendant to create an agency relationship for the purposes of joint liability under the ADEA.

### d. "Industry–Wide Discrimination"

Plaintiffs do not contend that their allegations fit within the only recognized categories of joint liability under the ADEA. Rather, Plaintiffs argue that their allegation that all Defendants "contributed to the industry-wide practice of age discrimination" that "discouraged" each Plaintiff from seeking employment is sufficient to impose joint and several liability. *See* FAC, at ¶ 14. The Court declines, however-

er, to extend the limits of joint and several liability to fit the contours of Plaintiffs' claim.

Plaintiffs cannot hold an employer liable based on some generalized allegation of an all-encompassing "industry-wide" discriminatory policy, where that policy is established by demonstrating individual discriminatory policies of other employers in the industry. In a similar vein, the Supreme Court has decided that a plaintiff alleging a discriminatory hiring policy cannot recover simply because that *same* employer had been shown to have a discriminatory promotional policy. The Court noted that "Title VII prohibits discriminatory employment *practices,* not an abstract policy of discrimination." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 2371 n. 15, 72 L.Ed.2d 740 (1982) (emphasis in original).

As discussed earlier, Plaintiffs do not allege that there is any uniform control over the hiring decisions among all Defendants, nor have they alleged that Defendants are linked in any of the ways described above. Plaintiffs' theory of industry-wide joint and several liability therefore attempts to contravene the principle that liability under employment discrimination laws may not be premised on the discriminatory practice of another, without an established relationship between the parties. *See Llampallas v. Mini–Circuits, Lab, Inc.,* 163 F.3d 1236, 1243 (11th Cir.1998) ("Congress intended to limit the scope of the Act to specific employment relationships" and to "limit the pool of potential plaintiffs under Title VII; otherwise, any person could sue an employer under the statute regardless of whether she actually had an employment relationship with that employer."); *Sidari,* 174 F.R.D. at 282 (finding plaintiffs' attempts to impose Title VII and

NYHRL liability on numerous defendants on the basis of disparate acts of discrimination improper, because it would amount to "guilt by association"). On these grounds, Plaintiffs' attempt to hold Defendants jointly and severally liable fails.

### 2. Single and Indivisible Harm

Since Plaintiffs' allegations of an "industry-wide" discriminatory practice cannot fit within the recognized liability structure of the ADEA, the harms that Plaintiffs' allege as a result of this practice also fail to permit their claim of joint and several liability. "If two or more persons, acting independently, tortiously cause distinct harms or a single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused." Restatement (Second) of Torts § 881 (1979). Here, Plaintiffs have alleged two basic harms: the emotional harm resulting from being "discouraged" from applying and the economic harm from Defendants' failure to hire. Neither provides the single, indivisible harm required for joint and several liability. *See* Restatement (Second) of Torts § 875; *see also Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir.1985); *United States v. Stringfellow*, 661 F.Supp. 1053, 1060 (C.D.Cal.1987).[16]

First, with respect to the emotional harm of "discouragement," to the extent that this type of injury is even actionable under the ADEA, this injury does not support Plaintiffs' contention of joint and several liability. This injury is premised on the theory that because there exists an industry-wide pattern or practice of discrimination, all Defendants must therefore be jointly and severally liable for the injury that Plaintiffs have suffered from their knowledge of this practice. However, this theory assumes what it is trying to prove. A plaintiff cannot recover merely because he believed that there was an industry-wide practice of discrimination; the unlawful discriminatory practice must actually exist.[17] Since Plaintiffs' allegations of an industry-wide practice of discrimination in this case do not conform with the liability framework of the ADEA,[18] as previously discussed, Plaintiffs are unable to state a viable claim for age discrimination in this regard. Therefore, because Plaintiffs are legally incapable of demonstrating that an industry-wide practice of age discrimination actually existed, any belief of such an

**16.** The Court recognizes that Plaintiffs are alleging statutory violations that contain their own liability guidelines, and therefore Plaintiffs' reliance on a tort doctrine may not even be applicable.

**17.** The Court is not suggesting that Plaintiffs must prove the practice of age discrimination at the pleading stage. Plaintiffs are allowed to allege discrimination against each Defendant separately, and, if proven, are entitled to recover for their injuries. If an injury is of the type that cannot be properly allocated among multiple Defendants separately, then each Defendant is potentially liable for the entire injury that it was proven to have separately caused. *See* Restatement (Second) of Torts § 875. However, Plaintiffs cannot, as they attempt to do here, premise liability on

the idea that multiple Defendants have contributed to the alleged injury caused by the "industry-wide" discrimination, when such form of discrimination, as set forth in Plaintiffs' complaint, is not actionable under the ADEA.

**18.** As one court has noted, "Violations of the ADEA . . . are governed by a complex statutory scheme—for instance, liability is limited to 'employers,' punitive damages are capped, and a claim must be filed with the Equal Employment Opportunity Commission before a private lawsuit may be brought.... We therefore hold that the enforcement of rights secured through the ADEA must be pursued in the manner specified in the ADEA ..." *Nance v. Maxwell Fed. Credit Union*, 186 F.3d 1338, 1342 (11th Cir.1999).

industry-wide practice is solely the subjective belief of the Plaintiffs. "Basing recovery on that fact is an improper consideration. The question is whether or not the company did in fact discriminate, not whether or not the employee did in fact believe the company had discriminated. It is at once apparent that the consideration of these two questions is entirely different." *Lewis v. Tobacco Workers Int'l Union*, 577 F.2d 1135, 1143 (4th Cir.1978)

This Court has already discussed the legal pitfalls of joining Defendants, and the lack of sufficient allegations on the part of Plaintiffs to overcome these obstacles. Plaintiffs' attempt to premise joint and several liability on the above injury is no more availing than an attempt to hold employers in entirely different industries jointly liable, merely because they are both alleged to have separately discriminated against an individual, and therefore are both liable for the cumulative emotional harm. Plaintiffs are not suing on a mass tort claim, they are suing on the carefully-constructed liability framework of anti-discrimination laws; Plaintiffs' attempt to create joint and several liability in this manner is simply a back-ended way of making one employer liable for another employer's alleged discrimination. However, each employer's alleged discriminatory practice creates liability only for the injuries cause by *that* practice. One employer cannot be deemed to have contributed to the harm caused by the knowledge of another employer's alleged discriminatory policies, when those employers are unrelated other than by being in a common industry. Plaintiffs' attempt to create such liability has no legal authority and is impermissible under the ADEA, and Plaintiffs cannot proceed in this manner.

Moreover, to the extent that the harm Plaintiffs allege is the economic injury stemming from a refusal to hire, it is not indivisible. One Defendant's refusal to hire a Plaintiff is clearly divisible from another Defendant's refusal to hire that same Plaintiff. In fact, Plaintiffs' own complaint makes it clear that the harm is divisible. For example, not every Plaintiff sues every Defendant; some Plaintiffs contend that they were harmed by some Defendants, but not others. In addition, some Plaintiffs allege that they sought employment with some, but not other Employer Defendants. Similarly, some Plaintiffs allege that they sought representation with some, but not other Agency Defendants. Furthermore, some Plaintiffs have also worked for some Employer Defendants, and some Plaintiffs have obtained representation with some Agency Defendants. Therefore, Plaintiffs' theory of joint and several liability on the grounds of a single and indivisible harm lacks merit.

### 3. Conclusion

Plaintiffs' theory of joint and several liability defies the ADEA's liability framework and is contrary to general legal principles of joint and several liability. Therefore, the Court dismisses with prejudice Plaintiffs' claims in the First Cause of Action, under the ADEA, the FEHA, and the NYHRL, seeking to hold each Employer Defendant and Agency Defendant jointly and severally liable for alleged acts of discrimination by other Defendants pursuant to a uniform "industry-wide" practice of age discrimination. Furthermore, to the extent that Plaintiffs also seek to impose liability in the Second Cause of Action on the same theory of joint and several liability, those claims are also dismissed with prejudice.[19]

---

**19.** Again, the Court does not preclude Plaintiffs from asserting, to the extent that they can

otherwise satisfy the pleading requirements, that Plaintiffs' knowledge of a Defendant's

## D. DETERRED APPLICANTS

 Plaintiffs readily admit that many of the individual Plaintiffs have not applied for employment with many of the Employer Defendants, and have not sought the services of many of the Agency Defendants. Plaintiffs argue that every Plaintiff who falls under this category was "deterred" either from applying for a job or from seeking representation because of the pervasive ageist policies in the industry.

 Generally, a plaintiff makes out a prima facie case of intentional age discrimination under the ADEA by demonstrating that he was (1) within the class of individuals between the ages of forty and seventy, (2) that he was qualified for a particular position, (3) *that he applied for that position,* and (4) that a younger person with similar qualifications received that position. *See Cotton v. City of Alameda,* 812 F.2d 1245, 1248 (9th Cir.1987); *Sakellar v. Lockheed Missiles and Space Co.,* 765 F.2d 1453, 1455 (9th Cir.1985); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

However, as Plaintiffs correctly point out, and as this Court has noted above, a different approach can be taken to prove that an employer engaged in intentional discrimination. The Supreme Court has held that a prima facie case can be made by "demonstrating the existence of a discriminatory pattern or practice," which then establishes a presumption that "individual class members ha[ve] been discriminated against ..." *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976).

Nevertheless, the question remains whether Plaintiffs may be members of a class asserting these "pattern or practice" allegations if they never applied to work for, or sought representation from, Defendants in the first place. As mentioned above, Plaintiffs contend that this pattern of discrimination deterred the nonapplicant Plaintiffs from applying, and thus they should be permitted to assert a claim against Defendants.

Both Plaintiffs and Defendants rely primarily on *International Brotherhood of Teamsters v. United States,* supra, in support of their respective contentions that the "deterrence theory" should and should not be permitted. In *Teamsters,* the Government, as plaintiff, alleged a pattern or practice by the defendant employer of discriminating against African–Americans and Spanish-surnamed persons in hiring for a coveted position of line driver. *Id.* at 324, 97 S.Ct. at 1848. The Court determined that once the Government establishes the initial burden of demonstrating that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers," the burden then shifts to the employer to defeat this claim by showing that the Government's proof is "either inaccurate or insignificant." *Id.* at 360, 97 S.Ct. at 1867. If the employer fails to rebut the Government's contention, the trial court could then conclude that there was a violation.

---

company-wide discriminatory policy caused Plaintiffs to suffer emotional harm. Plaintiffs may further assert that the emotional harm cannot be fairly apportioned among the harm caused by Plaintiffs' knowledge of other Defendants' separate company-wide discriminatory policies. However, merely making such an assertion would not compel joinder of Defendants into a single action, and the actions against each Defendant or related group of Defendants would have to proceed separately. *See, e.g., Boyd v. Diebold, Inc.,* 97 F.R.D. at 722.

However, in order to grant individual relief, the Government needs to show that an alleged individual discriminatee unsuccessfully applied for a job. *Id.* at 361–62, 97 S.Ct. at 1867–68. Nevertheless, the Supreme Court acknowledged that not having applied for the job will not necessarily preclude an individual from gaining relief. "A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection. . . . When a person's desire for a job is "not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application" *Id.* at 365–66, 97 S.Ct. at 1870.

Plaintiffs therefore contend that, under *Teamsters,* they are entitled to assert a right to relief for age discrimination against employers to whom they were deterred from applying. Defendants, on the other hand, focus on the Court's use of the term "futile gesture" in their contention that the deterred applicant theory should only be applied in limited circumstances, to which this present case would not apply.

Since *Teamsters,* courts have allowed plaintiffs to assert a deterred applicant theory only in those cases where the defendant employer hired remarkably few individuals from the protected class. In *Teamsters,* for example, in communities with a 10 to 50 percent black population, the defendant employed not one black "line-driver" before the suit commenced. 431 U.S. at 337 n. 17, 97 S.Ct. at 1855 n. 17. The Supreme Court found that "fine tuning of the statistics could not have obscured the glaring absence of minority line drivers," because "the company's inability to rebut the inference of discrimination came not from a misuse of statistics but

from 'the inexorable zero.'" *Id.* at 342 n. 23, 97 S.Ct. at 1858 n. 23. The Supreme Court permitted *each* driver, on remand, to undertake "the not always easy burden of proving that he would have applied for the job had it not been for [the discriminatory] practices." *Id.* at 368, 97 S.Ct. at 1871; *see also Gifford v. Atchison, Topeka and Sante Fe Ry. Co.,* 685 F.2d 1149, 1154 (9th Cir.1982) (permitting a deterred applicant claim despite a failure to apply for promotion to "wire chief," where defendant employed no women "wire chief"); *Sandoval v. Saticoy Lemon Ass'n,* 747 F.Supp. 1373, 1391–93 (C.D.Cal.1990) (finding that application would have been futile where the record reflected a "glaring disparity," in that only women were hired to fill traditionally "female" jobs and men were hired to fill all but approximately two percent of traditionally male general labor jobs). The *Teamsters* futile gesture doctrine has been applied to ADEA claims. *See, e.g., Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1213 (2d Cir.1993) (applying futile gesture doctrine to ADEA claim).

■ Plaintiffs contend that their allegations of a pattern or practice of age discrimination in the television industry grants them leave to pursue a deterred applicant theory. The standard for pursuing a *Teamster's* "pattern-or-practice" discrimination claim, however, is not an equivalent standard for proceeding with a deterred applicant theory. In order to pursue the latter claim, Plaintiffs must allege facts sufficient to support an inference that applying for a job would have been a "futile gesture." *See, e.g., Yartzoff v. Thomas,* 809 F.2d 1371, 1374 (9th Cir. 1987) (noting that the failure to apply for a position will not defeat a Title VII action only "in unusual circumstances").

The Court is mindful of the fact that this case is at its early stages, unlike many of the "deterred applicant" cases cited below,

which were often based on summary judgment motions brought later in the proceedings. However, those cases are instructive with regard to the principles of law that Plaintiffs must eventually satisfy in order to succeed in its many causes of action. More importantly, to the extent that the Court can conclude beyond doubt that Plaintiffs will not be able to prove facts that would satisfy those principles, based on the information in the complaint, those causes of actions can be dismissed for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999).

In *Brown v. Coach Stores, Inc.*, 163 F.3d 706 (2d Cir.1998), the Second Circuit rejected the plaintiff's futility argument in a pattern and practice allegation, and dismissed the plaintiff's complaint with prejudice. The court concluded that the "general statistics" alleged were unlikely to show a history of discrimination by the employer to the class of plaintiffs, which was necessary to proceed with a deterred applicant theory. *Id.* at 711, 713. Moreover, the plaintiff's failure to plead "the specific positions to which she would have applied had the alleged discriminatory practices not existed" was fatal to her claim. *Id.* at 711–12.[20]

In *Fox v. Baltimore City Police Dept.*, 201 F.3d 526 (4th Cir.2000), a case involving the Veterans' Reemployment Rights Act (VRRA), the plaintiffs asserted that they did not put their names on the Police Department's waiting list to enlist in the Armed Forces reserves because doing so would have been a futile gesture. *Id.* at 534. The Fourth Circuit refused to extend the futile gesture doctrine to this situation, observing that, although the "odds of being elevated from the waiting list were not good," the plaintiffs had not established that putting their names on the waiting list would have been futile, especially as "many of their colleagues saw fit to do so, and some ultimately gained access to the reserve waiting list." *Id.* at 535.

Although Plaintiffs in this case are correct in their assertion that a deterrence claim does not require a threshold showing that no person of the plaintiff's age had ever been hired, they are incorrect in their proposition that a prima facie showing of pervasive discrimination can sufficiently serve as the basis for a deterrence claim. The threshold for application of the futile gesture doctrine and for making a prima facie showing of discrimination are not identical. For the futility doctrine, courts look to whether a plaintiff has alleged facts that, taken as true, support the inference that it would have been futile to apply—not simply whether the plaintiff can sufficiently allege a discriminatory practice.[21]

Plaintiffs cite three Ninth Circuit decisions to demonstrate that a plaintiff may base a deterrence claim on a significant statistical disparity. However, those cases can be distinguished from the present case on at least three grounds. First, those

---

**20.** The Court recognizes that there is some dispute over whether a plaintiff must allege a specific position for which he would have applied under a deterred applicant theory. However, the Court has not at this time required such an allegation, and a final determination of this issue is not otherwise central to the Court's analysis.

**21.** Plaintiffs ask the Court to look at the hiring rates of writers over the age of fifty in determining whether an application for employment would have been futile. However, Plaintiffs are filing this claim on behalf of writers over the age of *forty*. Therefore, ignoring statistics of writers over forty would be illogical, to say the least. Using allegations of discrimination against one group to create liability on behalf of another group unfortunately appears to be a common theme throughout Plaintiffs' claim.

cases do not suggest that a prima facie showing of a pattern or practice of discrimination is sufficient to satisfy the requirements for demonstrating that it would be futile to apply for a job or a promotion. Second, the hiring and promotion statistics in those cases do not approach the ratio of more than one in three hires from the protected class as alleged by Plaintiffs here. Third, each of those cases dealt with a single employer, specific job openings or categories of jobs, and clear factual indicia of futility.

In *Domingo v. New England Fish Co.*, supra, the district court had certified a class that included non-applicants. That certification was not challenged on appeal. In that case, the job classifications were segregated 100%, 96%, 93%, and 90% white. *Id.*, 727 F.2d at 1433. The company labeled the work crew by race and the housing was almost entirely segregated. *Id.* at 1433–34. The Ninth Circuit observed that, "[g]iven the extreme segregation in both living and working environments and Nefco's use of racial labels, it can be assumed that all Nefco employees were aware of its discriminatory hiring practices." *Id.* at 1445.

In *Bouman v. Block*, 940 F.2d 1211 (9th Cir.1991), a sexual discrimination case, the plaintiff applied for a promotion to sergeant, took the qualification examination in 1975, and was placed on an eligibility list. *Id.* at 1217. She ultimately ended up at the top of the list, but was told by her superior and others that she would not be promoted, despite available vacancies. *Id.* Based upon these facts, the district court found that even through she had not taken the 1977 examination, she had standing to challenge that test as discriminatory. *Id.* at 1221–22. The Ninth Circuit applied a "deferential, clearly erroneous" standard to the district court's findings, and affirmed the district court's determination

that it would have been futile for the plaintiff to take the test for promotion. *Id.* Circumstances particular to that plaintiff, not statistical evidence, were the reasons for the district court's willingness to apply the futility standard. *Id.* at 1222. The court observed that a non-applicant is not barred from proceeding with a discrimination claim where the factual circumstances support a finding of futility. *Id.*

In *Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757 (9th Cir.1980), the plaintiff was routinely passed over for a promotion, and the court found that the evidence presented regarding her allegations of sex discrimination was sufficient to preclude summary judgment. *Id.* at 762. However, although the plaintiff was permitted to pursue this claim despite her failure to apply for a promotion, the Ninth Circuit placed significance on the plaintiff's allegations that one did not apply for a promotion in the defendant's organization, but instead had to be sought out. *Id.* at 761. That situation clearly does not parallel the facts before the Court in the present case.

Defendants urge this Court to dismiss all Plaintiffs' allegations of futility with prejudice, because based on Plaintiffs' own statistics included in their complaint, Plaintiffs' claims of futility "fail[ ] as a matter of law." Employer Defendants' Joint Memorandum of Points and Authorities in Support of Their Motions to Dismiss, or, in the Alternative, to Strike, and to Sever ("Employer Defendants' Motion"), at 26. Defendants direct this Court to the 1998 Hollywood Writers' Report, "A Survey of the Employment of Writers in the Film, Broadcast and Cable Industries for the Period 1991–1997" (the "Guild Report"), referred to in Plaintiffs' complaint. Defendants request that this Court consider this document in ruling on its 12(b)(6) motion. *See, e.g., Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994) ("[D]ocu-

ments whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss."); *accord Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001) *amended by* Nos. 99–15602, 99–17186, 2001 DJDAR 13395, 13398 (9th Cir. Dec. 28, 2001).[22]

The Ninth Circuit has previously held that, although a plaintiff is not required to include every available detail in his complaint, a plaintiff can "plead himself out of a claim by including unnecessary details contrary to his claims." *Sprewell*, 266 F.3d at 988, 2001 DJDAR at 13398. *See also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir.1998) ("[W]e are not required to accept as true conclu-

sory allegations which are contradicted by documents referred to in the complaint."); *Soo Line R.R. v. St. Louis Southwestern Ry., Co.*, 125 F.3d 481, 483 (7th Cir.1997) ("A plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts.").

Plaintiffs admit through the statistics provided in the complaint that during the 1997/1998 broadcast season, writers over forty made up one third or more of the writing staff of most of the Employer Defendants. *See* FAC, at ¶¶ 303, 305, 307, 308, 310, 312, 315 (percentages of writers over forty at NBC, Viacom, Universal, Time Warner, Fox, Disney, and Columbia Tri–Star were 34%, 45%, 42%, 33%, 34%, 41%, and 32%, respectively). In episodic comedy, where Plaintiffs allege "particu-

---

**22.** Plaintiffs' argument that the Court should not consider this document is misguided. Plaintiffs claim that the information in the Guild Report is not central to their complaint, and its contents are subject to dispute. First, the contention that the statistics in the Guild Report are not central to the complaint is simply false. Aside from the fact that the statistics do not necessarily have to be "central" to the complaint for the Court to consider them, an entire portion of Plaintiffs' complaint is based entirely on the statistics in the Guild Report, entitled "The Statistical Evidence Supporting the Industry–Wide Practice of Age Discrimination Against Older Writers" (*See* FAC, at ¶¶ 271–77), and Plaintiffs reference the statistics in the Guild Report several times throughout their complaint and briefs. Moreover, statistics, while generally not sufficient on their own, are often a vital component in demonstrating the existence of a pattern or practice of discrimination. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Teamsters*, 431 U.S. at 339, 97 S.Ct. at 1856.

Furthermore, Plaintiffs' argument that the statistics in the Guild Report are subject to

dispute is inconsequential, and, in fact, reflects poorly on Plaintiffs, since this amounts to a tacit admission that the statistics on which Plaintiffs' claim relies are unreliable. In *Branch v. Tunnell*, supra, the Ninth Circuit held that a document is not outside the complaint if the document is referred to in the complaint, which is the case here (*See, e.g.*, FAC, at ¶ 271), and if its authenticity is not questioned, which again is satisfied here. *See Branch*, 14 F.3d at 453. The reliability of the information contained in the document is not an issue for the Court to consider. The document is not regarded as evidence independently submitted by Defendants, but instead as an exhibit that Plaintiffs could have but neglected to include as part of their complaint. *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327, at 762–63 (2d ed. 1990) ("[W]hen plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading.") Therefore, the document is properly considered by the Court in ruling on this Rule 12(b)(6) motion, and any potential insufficiencies in the statistics contained in the document will serve as a reflection of the inadequacies in the allegations contained in Plaintiffs' complaint.

larly severe" discrimination, they allege that the writers over the age of forty held "over thirty percent of the jobs." FAC, at ¶ 3. Moreover, the Guild Report shows that there was "a slight *increase* in the representation of writers over 40 in television employment from 1991 to 1997, *increasing from 53% to 57%* over the period." Defendants' Request for Judicial Notice, Ex. B ("Guild Report"), at 81, *available at* http://www.wga.org/manual/Report/older.html (emphasis added).

In their briefs, Plaintiffs place a great majority of their argument for a deterred applicant theory, and their discrimination claim in general, on the contention that "the disparity in employment rates shown by the Guild report is measured by a 'glaring' 16 standard deviations' ..." Plaintiffs' Opp'n, at 17; *see also* Plaintiffs' Surreply, at 1. Although Plaintiffs claim to have derived this figure from the statistics referenced in the complaint, Plaintiffs do not make it clear to the Court *how* they derive this figure. It is inappropriate, to put it simply, for a party to make a conclusory statistical inference as the foundation for its claim, and not provide the Court with any indication of the basis for that inference. In fact, when the Court con-

ducted its own statistical analysis using the information available in the Guild Report, it could find no evidence upon which a reliable statistical calculation of this sort could be based.[23] The fact that Plaintiffs need to resort to statistical manipulation in order to prove their claim speaks volumes about its viability.

From the statistics available in the complaint and the Guild Report, Defendants ask this Court to conclude that no writer can, as a matter of law, state a claim under the futility doctrine established in *Teamsters*. Essentially, Defendants are asking this Court to rule that no matter how unique an individual's circumstances, he or she cannot allege a claim as a deterred applicant when members of the protected class have approximately one-third of the jobs with the accused employer. This Court will not make such a generalized ruling.[24] While the Court is highly skeptical, in light of the alleged statistics, of Plaintiffs' ability to show that applying for a position with an Employer Defendant— whether directly or via an Agency Defendant—would have been futile, the Court declines to make that determination at this time.[25] Although, according to *Sprewell*,

---

**23.** *See* Appendix A.

**24.** By way of example, the Court notes that federal agency guidelines for the establishment of statistical proof in a disparate impact claim (the Uniform Guidelines on Employee Selection Procedures) require a showing that the protected group is selected at a rate less than 80 percent of that achieved by the group with the highest selection rate. 28 C.F.R. § 50.14 at § 4(d) (1978). Previous Ninth Circuit cases have criticized these guidelines, known as the "80 percent rule," and instead advised that a court look more generally to whether the statistical disparity is "substantial" or "significant." *See Clady v. County of Los Angeles,* 770 F.2d 1421, 1428–29 (9th Cir.1985). Nevertheless, the Ninth Circuit has also noted that "while the guidelines are not necessarily dispositive, they are instructive." *Bouman v. Block,* 940 F.2d at 1225.

**25.** Plaintiffs also argue that, even if the hiring statistics alleged by Plaintiffs prohibit a finding of futility, it is sufficient for Plaintiffs to allege a reasonable belief that they were discouraged. While some courts have considered the plaintiffs' subjective belief in the futility of submitting an application as part of the deterred applicant analysis, no court has ever determined a plaintiff's subjective belief to be sufficient on its own. *See, e.g., Reed,* 613 F.2d at 761–62 (acknowledging that women had a "legitimate belief" that an application would be futile, relying on the fact that they were given no notice of any opening, nor were they sought out for a promotion).

Many of the cases previously cited demonstrate that courts rarely discuss the plaintiff's belief regarding his or her chances, but rather examine the individual facts and circumstances surrounding the hiring decision. *See*

the statistics alleged in the complaint could form the basis for a dismissal with prejudice, the Court feels that it ought to give Plaintiffs an opportunity to replead its deterred applicant theory with greater sufficiency, if they are so able and so desire.

Courts applying the futility doctrine have examined the attendant facts and circumstances of the individual case in order to determine the validity of a claim under the futility doctrine. *See Teamsters*, 431 U.S. at 368, 97 S.Ct. at 1871; *Bouman v. Block*, 940 F.2d at 1221–22. The propriety of such an individualized approach to examining a plaintiff's futility claims is established by an examination of the factual allegations in the Plaintiffs' complaint in this case. For example, many Plaintiffs are alleged to have "made efforts" to find employment or seek representation with one or more of the Defendants. In this regard, many courts have found that plaintiffs' prior application history may render the "futile gesture" doctrine inapposite. *See Brown*, 163 F.3d at 711–12 ("the fact that [the plaintiff] felt comfortable on at least two occasions generally requesting to be promoted belies the notion that a specific application would have been in vain."); *Sondel v. Northwest Airlines, Inc.*, No. CV–3–92–381, 1993 WL 559028 at *3 n. 5 (D.Minn. Jan.14, 1993) (refusing to accept a deterred applicant argument because the plaintiff "did actually apply, and cannot, therefore, maintain that she was deterred from applying based on the alleged discrimination"). Furthermore, situations unique to each Plaintiff may give rise to an inference that actively seeking a writing position would have been futile for that particular Plaintiff.

In their complaint, however, Plaintiffs have not alleged sufficient facts related to every individual, that if proven to be true, are sufficient to meet the "not always easy burden of proving that [a plaintiff] would have applied for the job had it not been for those [discriminatory] practices." *Teamsters* 431 U.S. at 368, 97 S.Ct. at 1871. For example, as previously mentioned, Plaintiff Tracy Keenan Wynn, the first named Plaintiff, has not specifically alleged to either having applied, or having been deterred from applying, to work for Defendant NBC, the first named Defendant. If the Plaintiffs wish to pursue a deterred applicant theory, it must conform with the law and be pled specifically and sufficiently with regard to each employer. Of course, the Federal Rules of Civil Procedure do not require Plaintiffs to prove a prima facie case at the pleading stage, but they do require that Plaintiffs, at a minimum, provide a short and plain statement showing that the Plaintiffs are entitled to relief (i.e. averments in the complaint that sufficiently establish a basis for judgment) against each Defendant. *See Yamaguchi v. United States Dept. of the Air Force*, 109 F.3d 1475, 1481 (9th Cir.1997). Thus, while it appears doubtful that many, if any, Plaintiffs will be able to satisfy the requirements for a deterred applicant theory, the Court will not preclude such a theory at this time. Therefore, Plaintiffs' "deterred applicant" allegations are dismissed without prejudice and with leave to amend.

*Fox v. Baltimore City Police Dept.*, supra; *Brown v. Coach Stores, Inc.*, supra; *see also Lewis v. Tobacco Workers Int'l Union*, 577 F.2d at 1143 ("The question is whether the company did in fact discriminate, not whether or not the employee did in fact believe the company had discriminated."). *See generally*

*Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir.1990) (noting that the decision of whether a numerical disparity is sufficiently significant is judged on a case by case basis) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 2789 n. 3, 101 L.Ed.2d 827 (1988)).

However, Plaintiffs are cautioned that no case applying the *Teamsters* "deterred applicant" theory has ever allowed an applicant to satisfy his burden by proving that he did not apply for a job due to the discriminatory practices of an unrelated entity, or a general perception of industry-wide hostility to his application. To the extent Plaintiffs were discouraged by the acts of other Defendants, the discouragement theory is simply another way of attempting to allege joint and several liability. As noted earlier, Plaintiffs' allegations of joint and several liability between unrelated Defendants have been dismissed with prejudice. This dismissal naturally includes any assertion of liability against one Defendant based on allegations of general discouragement on the part of other Defendants who have separate and independent hiring practices.

If Plaintiffs' theory is that all parties are responsible for some general perception formed by prior acts of alleged discrimination of other entities, this theory fails as a matter of law. *See Lewis v. Tobacco Workers Int'l Union*, 577 F.2d at 1143; *E.E.O.C. v. Sheet Metal Workers, Int'l Ass'n*, 463 F.Supp. 388, 424–25 (D.Md. 1978) (holding that a defendant must violate Title VII, not merely have a reputation for such violation); *cf. General Tel. Co. of Southwest v. Falcon*, 457 U.S. at 159 n. 15, 102 S.Ct at 2371 n. 15 (finding that employment discrimination laws "prohibit[ ] discriminatory practices, not an abstract policy of discrimination").

Therefore, if Plaintiffs choose to amend their complaint to plead that they were deterred from applying for a position with a specific employer, Plaintiffs must plead how a particular Plaintiff was deterred from applying to a particular Defendant *by that Defendant's actions.*

## E. AGENCY DEFENDANTS' LIABILITY UNDER THE ADEA AND THE FEHA

### 1. Liability Under The ADEA

The ADEA prohibits age discrimination by "employers" and "employment agencies." 29 U.S.C. § 623(a) and (b). Agency Defendants argue that because they are neither "employers" (with respect to Plaintiffs) nor "employment agencies" within the meaning of the ADEA, Plaintiffs' ADEA claims against the Agency Defendants must be dismissed with prejudice.

■■■ Plaintiffs do not allege that the Agency Defendants are employers. Rather, Plaintiffs allege that the Agency Defendants are employment agencies, in that they "[procure] employment opportunities for television writers" and are in the business of "land[ing] jobs for their clientele with Hollywood employers." FAC, at ¶¶ 285, 291. Alternatively, Plaintiffs argue that even if the Agency Defendants are not "employment agencies," the ADEA makes them liable for interference with Plaintiffs' ability to obtain access to employment opportunities.

### a. Definition of "Employment Agency"

The term "employment agency" is defined by the ADEA to mean "any person regularly undertaking with or without compensation *to procure employees for an employer* and includes an agent of such a person; but shall not include an agency of the United States." 29 U.S.C. § 630(c) (emphasis added). Agency Defendants argue that the ADEA does not, by its terms, apply to organizations like the Agency Defendants, because they do not "procure employees for an *employer,*" but rather, as acknowledged in Plaintiffs' complaint, "procure employment opportunities for their *employee clients.*" Memorandum of

Points and Authorities of Talent Agency Defendants in Support of Motion to Dismiss ("Agency Defendants' Motion to Dismiss"), at 5.

In determining whether Congress intended talent agencies to be covered under the ADEA definition of "employment agency," because neither party has located a single case in which a talent agency was either covered under or excluded from the ADEA, the Court will look to the provisions of Title VII for guidance. It is widely recognized that the ADEA was derived substantially from Title VII. *See, e.g., McKennon v. Nashville Banner Publishing Co.,* 513 U.S. 352, 356, 115 S.Ct. 879, 884, 130 L.Ed.2d 852 (1995) ("The substantive, anti-discrimination provisions of the ADEA are modeled upon the prohibitions of Title VII."); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621, 83 L.Ed.2d 523 (1985) ("[I]nterpretation of Title VII ... applies with equal force in the context of age discrimination, for the substantive provisions of the ADEA were derived *in haec verba* from Title VII." (internal quotations omitted)); *Hodgson v. First Federal Savings & Loan Assn.,* 455 F.2d 818, 820 (5th Cir. 1972) ("With a few minor exceptions the prohibitions of [the ADEA] are in terms identical to those of Title VII of the Civil Rights Act of 1964.").

The definition of "employment agency" under Title VII is more expansive than the ADEA definition. Under Title VII, "The term 'employment agency' means any person regularly undertaking with or without compensation to procure employees for an employer *or to procure for employees opportunities to work for an employer* and includes an agent of such person." 42

U.S.C. § 2000e(c) (emphasis added). Thus, this definition is identical to the ADEA definition, except that it includes the additional phrase "or to procure for employees opportunities to work for an employer." Agency Defendants assert that this is precisely the scope of their business: procuring for employees opportunities to work for an employer.[26]

The distinction in language is anything but in significant. As the Supreme Court has repeatedly noted, "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Bates v. United States,* 522 U.S. 23, 29–30, 118 S.Ct. 285, 290, 139 L.Ed.2d 215 (1997) (quoting *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983)). In the ADEA, Congress copied verbatim the Title VII statute's definition of "employment agency," but omitted the phrase "or to procure for employees opportunities to work for an employer."

The distinction between procuring employees for an employer and procuring for employees opportunities to work for employers was recognized in *EEOC v. Local 350, Plumbers and Pipefitters,* 842 F.Supp. 417 (D.Nev.1994). In *Plumbers,* the court held that a union that operated a hiring hall was not an employment agency under the ADEA, because a labor union hiring hall could not be viewed as procuring employees for an employer. The Court reasoned that "[a] labor union hiring hall procures jobs for its members; its hiring hall function is not intended to aid employers, it is intended to aid its mem-

---

**26.** As defined in the Talent Agencies Act, the licensing statute governing the operation of talent agencies in California, a talent agency is "a person or corporation who engages in the occupation of procuring, offering, promising, or attempting to procure employment or engagements for an artist or artists ..." Cal. Lab.Code § 1700.4(a).

bers". *Id.* at 421. The court readily recognized the distinction between procuring opportunities for the union members and procuring employees for employers; the former action does not place the union under the definition of an "employment agency."[27]

Plaintiffs do not attempt to reconcile the language of the ADEA and Title VII. Rather, Plaintiffs argue that the second clause of the Title VII definition ("or procure for employees opportunities to work for an employer") applies only to temporary agencies who place persons with employers in a capacity other than an employment relationship. Plaintiffs' interpretation is incorrect.

Temporary agencies who place their own employees to work temporarily with clients are functioning as employers for purposes of Title VII liability to those employees. *See Knight v. United Farm Bureau Mutual Ins. Co.,* 950 F.2d 377, 380 (7th Cir. 1991) ("In determining whether a business relationship is one of employer-employee [for Title VII purposes], courts look to the economic realities of the relationship and the degree of control the employer exercises over the alleged employee." (citations and internal quotations omitted)); *Mullis v. Mechanics & Farmers Bank,* 994 F.Supp. 680, 685 (M.D.N.C.1997) (finding that a temporary agency and the employer with whom the employee is temporarily placed are both employers for purposes of Title VII); *Amarnare v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 611 F.Supp. 344, 349 (S.D.N.Y.1984), *aff'd,* 770 F.2d 157 (2d Cir.1985) (same).[28]

Plaintiffs concede that temporary agencies may be covered as "employers," but assert that because the temporary agency will only be covered if it meets the statutory definition of employer (if it has fifteen or more employees, for example), there was a gap that Title VII's employment agency definition ("to procure for employees opportunities to work for an employer") was added to fill. Plaintiffs, therefore, argue that the only permissible conclusion from the absence of that phrase in the ADEA is that the gap-filler is not present. Plaintiffs cite no authority for this proposition, and it is otherwise unpersuasive.

Plaintiffs then argue that in order to construe the ADEA definition of "employment agency" to exclude talent agencies, one would have to interpret the phrase "for an employer" to mean "on behalf of an employer." Based on that unsubstantiated premise, Plaintiffs proceed in their argument by stating that the ADEA definition of "employment agency" cannot be limited to persons who procure employees "on behalf of" employers, because such a reading is incongruent with the definition of "labor organization" in § 630(e) of the ADEA. § 630(e) of the ADEA, as noted above, provides that a labor organization is covered by the ADEA if "it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer." Plaintiffs argue that because, by definition, a union does not act "on behalf of" an employer, Defen-

---

**27.** Instead, the union remained under the definition of a "labor organization," in part because § 630(e), defining when a labor organization is deemed to be engaged in an industry affecting commerce (and hence when it is covered under the ADEA), stated that it would be covered when "it maintains or operates a hiring hall or hiring office which procures

employees for an employer *or procures for employees opportunities to work for an employer* [.]" 29 U.S.C. § 630(e) (emphasis added).

**28.** The Court does not preclude the possibility that temporary agencies could also be considered employment agencies under the Title VII definition.

dant's interpretation of the phrase "for an employer" used to define an "employment agency" is incorrect. Plaintiffs' argument, however, is unavailing for three reasons.

First, Defendants do not claim that "for an employer" necessarily means "on behalf of an employer." This phrasing is entirely the work of Plaintiffs, who essentially create this argument, then attempt to show how it fails, and then use it to demonstrate how their interpretation of "employment agency" must be correct. While the Court declines to engage in wordplay of this sort, it is by no means evident that "for an employer" must be interpreted as "on behalf of an employer" in order to exclude talent agencies from the definition of "employment agency." By defining "employment agency" as only those individuals who procure employees for an employer, Congress may very well have intended to include agencies who engage in job placement, i.e. match an available employee with an available job opening. This type of agency does not necessarily work "on behalf of" an employer, but it does not necessarily "procure for employees opportunities to work for an employer" either. Although that is just an example, it is supported by the legislative history of the ADEA. Until 1974, the definition of "employment agency" used to include the

United States Employment Service (U.S.E.S.) and the system of State and local employment services receiving Federal assistance. *See* 29 U.S.C.A. § 630, Historical Notes (West 1999). The U.S.E.S. did not operate as a representative of either the employer or the employee. Instead, it attempted to match unemployed or otherwise available workers with job orders submitted by employers,[29] and thus is the type of agency contemplated by the language in § 630(c). In contrast, it is generally known that a talent agency is more selective in choosing who it will represent, and plays a more pro-active role in seeking employment *opportunities* for its clients, instead of waiting for a job opening to arise.

Second, Plaintiffs' argument fails because their reading of § 630(e) renders one of the two phrases "procures employees for an employer" or "procures for employees opportunities to work for an employer" redundant. Furthermore, Plaintiffs' rationale for the use of the latter phrase in Title VII—that it was meant to include "temp" agencies who hire out employees to work for an employer on a temporary basis—would be nonsensical in the context of a labor organization.[30]

---

**29.** *See Frederick County Fruit Growers' Ass'n v. Marshall,* 436 F.Supp. 218, 220 (W.D.Va. 1977) (explaining the function of a federal employment service).

**30.** Plaintiffs point out that an "employee" is defined in Title VII as "an individual employed by an employer." 42 U.S.C. § 2000e(f). Therefore, Defendants' interpretation of "procure for employees opportunities to work for an employer" as applying to talent agencies does not comport with this definition, because many of the talent agencies' clients are not "employees." While, in isolation, Plaintiffs' argument creates a more serious question as to the proper interpretation of "procure for employees opportunities to work for an employer," this argument does

not cure the defects in the other portions of Plaintiffs' argument, as noted above, and Defendants' interpretation is still otherwise more persuasive. Furthermore, the term "employees" (not "individuals" or " 'potential' or 'prospective employees' ") is used in the first part of the Title VII definition of "employment agency" as well (§ 2000e(c)), in addition to the definition of the covered functions of a "labor organization" (§ 2000e(e)) and the definition of "employment agency" in the ADEA (29 U.S.C. § 630(c)). Thus, if Plaintiffs' argument holds, it could be argued that the only entities that qualify as employment agencies or labor organizations are those that provide employment for those already employed. The Court will clearly not

Third, it is possible that union hiring halls may procure employees on behalf of employers who, for instance, open new divisions or relocate operations, and thus would allow for an interpretation of "for an employer" to mean "on behalf of an employer."

 The Court finds that Congress's use and juxtaposition of the two phrases discussed above was not inadvertent. The conspicuous absence of the phrase "procure for employees opportunities to work for an employer" in the ADEA definition of "employment agency" and its presence in both the Title VII definition of "employment agency" and the ADEA definition of the covered functions of a "labor organization" cannot be dismissed as accidental. Plaintiffs' explanation of the ADEA's defi-

nition of "employment agency" would render the "procure for employees" phrase superfluous in § 630(e). One of the primary canons of statutory construction is that "a statute should be construed so as to avoid making any word superfluous." *See United States v. Corona–Sanchez*, 234 F.3d 449, 454 (9th Cir.2000). The Court's interpretation of "employment agency," in that it does not include talent agencies such as the Agency Defendants, comports with these guidelines.[31]

### b. ADEA Liability for "Interference"

 As a final effort to create liability under the ADEA for the Agency Defendants, Plaintiffs assert that, even if Agency Defendants are not employers or employment agencies, they are liable because

---

adopt this interpretation. Therefore, Plaintiffs' argument regarding the use of the word "employees" in the "employment agency" definition is unavailing and does not disturb the Court's analysis.

**31.** As a final matter, Plaintiffs contend that it is "extremely doubtful" that Congress would have intended to insulate talent agencies from liability under the ADEA. *See* Plaintiffs' Opp'n, at 35. However, without any explicit indication as to what Congress actually intended with respect to talent agencies, the Court finds that it is within reason that Congress would seek to exclude talent agencies from liability under the ADEA, while including them under Title VII. It is well known that age is not considered a suspect class, in the same manner as historically prejudiced classes such as race and national origin. *See, e.g., Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2567, 49 L.Ed.2d 520 (1976) ("[A] suspect class is one saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process. While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated against on the basis of race or national origin, have not

experienced a history of purposeful unequal treatment or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." (internal quotations omitted)).

While Congress has chosen to legislate against age discrimination, it has also chosen to create a separate—although related—statutory regime from that of Title VII. Age discrimination in employment does not generally stem from the same type of deep-seated prejudice that underlies many other forms of invidious discrimination, *see id.*, but instead is often largely driven by certain economic motives of employers. In that regard, talent agencies have nothing to gain by discriminating against older workers, because the agencies would then deprive themselves of a financial opportunity if there was a demand for those workers. Hence, there is a rational basis behind excluding talent agencies from age discrimination liability, because the incentive to discriminate does not exist for talent agencies in the same manner as it does for employers, labor organizations, and other forms of employment agencies included under the ADEA. Thus, contrary to Plaintiffs' assertion, it is entirely possible that Congress had intended to exclude talent agencies from liability under the ADEA. Based on the language of the statute, that is the most logical conclusion that can be drawn.

their alleged refusal to refer older writers for employment interferes with Plaintiffs' employment opportunities.

Plaintiffs' argument is premised on the holdings in *The Ass'n of Mexican–American Educators ("AMAE") v. California*, 231 F.3d 572 (9th Cir.2000) and *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C.Cir.1973). These cases stand for the proposition that an entity may be liable under Title VII even if it is not a direct employer of the plaintiff, if it "interferes with an individual's employment opportunities with another employer." *AMAE*, 231 F.3d at 580 (quoting *Gomez v. Alexian Bros. Hospital*, 698 F.2d 1019, 1021 (9th Cir.1983)). In order for such liability to exist, however, the entity must have "actual '[c]ontrol over access to the job market.'" *AMAE* at 581 (quoting *Sibley*, 488 F.2d at 1341).

In *AMAE*, the Ninth Circuit held that Title VII applied to the State of California, even though it was not the direct employer of the local school district, because of the level of control it exerted over the school district.[32] In particular, California administers an allegedly discriminatory statewide examination, which all teachers must pass before being allowed to teach in California public schools.

In *Sibley*, the court held that a hospital was liable for sex discrimination under Title VII for its refusal to refer a private male nurse for employment with female patients. The court described the employ-

ment structure of private nurses in the District of Columbia as follows: "[H]ospital patients who require the services of a private nurse ask the Nursing Office of the hospital to communicate their need to one of the registries operating in the District ... When a patient at [defendant hospital] makes such a request, he or she is informed that neither the hospital nor the registry to which it will refer the offer of employment can discriminate on the basis of race, age or sex. The patient's request is telephoned to the Professional Nurses' Official Registry, which matches the request with the name of a nurse who has indicated his or her availability for work that day.... If, on arrival, the nurse is for any reason unacceptable to the patient, the patient is nevertheless obliged to pay the nurse for a full day's work. This registry and referral system is designed to insure that no private duty nurses are victimized by invidious discrimination." *Id.* at 1339. Even though it was the patients, not the hospitals, that actually employed the nurses, the court imputed Title VII liability on the hospitals, in part, because the hospitals "control the premises upon which those services were to be rendered, including [plaintiff's] access to the patient for purposes of the initiation of such employment." *Id.* at 1342.

Neither *AMAE* nor *Sibley* allow Plaintiffs to assert liability under the ADEA against the Agency Defendants. Both

**32.** The court stated: "Our conclusion is dictated by the peculiar degree of control that the State of California exercises over local school districts. In California, public schools are a matter of statewide rather than local or municipal concern; their establishment, regulation and operation are covered by the state constitution and the state Legislature is given comprehensive powers in relation thereto. The California legislature has plenary authority over the education of California's youth. It is well settled that the California Constitution makes public education uniquely a fundamental concern of the state and that the degree of supervision ... retained by the State over the common school system is high indeed. The state's involvement is not limited to general legislative oversight but, rather, affects the day-to-day operations of local public schools. Unlike most states, California school districts have budgets that are controlled and funded by the state government rather than the local districts." *AMAE*, 231 F.3d at 581 (internal quotations and citations omitted).

cases made it clear that liability for interfering with an individual's employment opportunities requires actual control over access to the job market. Both cases also involved almost absolute control on the part of the state and the hospital, respectively, over the plaintiffs' access to employment. Agency Defendants do not even approach that level of control, as indicated in Plaintiffs' complaint. First, Plaintiffs' complaint makes clear that one can seek employment from Employer Defendants directly, and thus employment does not rely entirely on being represented by one of the Agency Defendants.[33] Second, each Agency Defendant is just one talent agency in the entire television industry. Thus, no one Agency Defendant is capable of precluding an entire class of plaintiffs from obtaining employment. As previously discussed, since the Agency Defendants are not alleged to be a single entity with uniform employment practices, they cannot be liable for each others' allegedly discriminatory acts. Finally, it is also clear from Plaintiffs' complaint that there are other talent agencies in the television industry that are not one of the Agency Defendants. Therefore, based on the complaint, Plaintiffs' cannot sufficiently infer that Agency Defendants have the level of control over

access to the job market contemplated by *AMAE* and *Sibley*.[34]

Furthermore, in *Sibley*, the entire registry and referral system was designed so that the patient-employers, who had no liability under Title VII, did not discriminate, or at least not to the detriment of the nurses. Here, the Employer Defendants are clearly subject to their own liability under the ADEA, so there is no need, as in *Sibley*, to extend such liability to the Agency Dependants, who are neither employers nor employment agencies under the ADEA.

Therefore, based on the above discussion, Agency Defendants are not liable under the ADEA. Accordingly, Plaintiffs' ADEA claims against the Agency Defendants are dismissed with prejudice.

### 2. *Liability Under The FEHA*

 Plaintiffs also seek to hold Agency Defendants liable under the FEHA. However, § 12941(a), the section in the FEHA that creates liability for age discrimination, only creates liability for employers, and not employment agencies.

Plaintiffs, in lieu of any authority holding that employment agencies (not just talent agencies) are liable under the FEHA for age discrimination, offer two

---

**33.** To the extent that Plaintiffs now present arguments in their briefs that Employer Defendants will not accept scripts nor consider applicants for employment unless they are submitted or referred by a talent agency, those unsubstantiated comments are merely self-serving representations, and contradict the facts that Plaintiffs have themselves put forth in their complaint, on which this Court must rely in conducting its analysis. *See, e.g.,* FAC at ¶¶ 153, 175, 263.

**34.** Similarly, in *Gomez v. Alexian Bros. Hospital,* supra, a case on which *AMAE* relied, plaintiff was permitted to assert a Title VII claim against the defendant hospital for interfering with his employment opportunities, al-

though the defendant was not a direct employer of the plaintiff. In that instance, plaintiff's corporate employer ("AES") submitted a proposal to operate the emergency room in the defendant hospital, and under that proposal the plaintiff would have served as the director of the emergency room. *Id.,* 698 F.2d at 1020. The defendant denied the proposal for allegedly discriminatory reasons, and thereby exercised complete control in interfering with the plaintiff's opportunity to be employed by AES as director of defendant's emergency room. *Id.,* at 1021. Again, the complete control exercised by the defendant in *Gomez* over the plaintiff's employment opportunities does not exist in the present case.

arguments in support of their position: (1) the holdings in *AMAE* and *Sibley* create employment agency liability under the FEHA; and (2) additional provisions of the FEHA demonstrate that the California legislature intended to impose liability upon employment agencies. Both of these arguments fail.

First, the Court has discussed above why *AMAE* and *Sibley* do not create liability for Agency Defendants under the ADEA. Therefore, under no theory of law could those holdings create liability under the FEHA. Second, the FEHA provisions that Plaintiffs claim demonstrate the legislative intent to create employment agency liability for age discrimination are unpersuasive.

As an initial matter, Plaintiffs' argument would have the Court conclude that the California legislature intended to include employment agencies under the FEHA age discrimination provision, when they explicitly did not include them under that provision, nor did they include labor organizations, despite expressly mentioning both of those groups in provisions relating to other types of discrimination. That conclusion defies logic. Nevertheless, that is precisely what Plaintiffs attempt to argue.

As part of their argument, Plaintiffs claim that § 12940(k),[35] which makes it an unlawful employment practice for employment agencies (among other groups) to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring, applies to age. However, the provisions of § 12940 do not mention age discrimination, while they do mention discrimination on the basis of race, reli-

gious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, and sexual orientation. *See* Cal. Gov't Code § 12940(a). Age discrimination is discussed in a separate section, § 12941. Therefore, it would be improper to construe 12940(k) as applying to age discrimination, when that form of discrimination is not referenced anywhere in that section.[36]

Additionally, Plaintiffs argue that the inclusion of employment agencies in § 12941(b), which states, "This section shall not limit the right of an employer, employment agency, or labor union to select or refer the better qualified person from among all applicants for a job," implies that employment agencies were meant to be included in § 12941(a). However, that would be reading subsection (b), which limits the liability for age discrimination, as actually extending the liability for age discrimination under subsection (a). This Court will not construe the statute in such a way. As Agency Defendants suggest, the inclusion of employment agencies in subsection (b) may have been intended to avoid the incongruous result of finding employment agencies liable for aiding and abetting employer discrimination (pursuant to § 12940(i)) in instances where the employer itself would not be liable. Certainly, this interpretation of the provision is more logical than the alternative, which is to presume that the legislature intended to create age discrimination liability for employment agencies despite excluding them from the provision prohibiting such discrimination, even though employment agencies are included in numerous provisions prohibiting other

---

**35.** Plaintiffs actually reference subsection (i), but that subsection has been changed to (k) after recent amendments.

**36.** Age is included as one of the enumerated categories in § 12940(j)(1), but that is only in the context of harassment, not discrimination.

types of discrimination.[37]

■ Clearly, the California legislature could have also included age as one of the protected classes under § 12940(a) (as it did for harassment under § 12940(j)(1)), but instead opted to create a separate, narrower provision exclusively for age discrimination, under § 12941. "When the Legislature has spoken, the court is not free to substitute its judgment as to the better policy." *City and County of San Francisco v. Sweet*, 12 Cal.4th 105, 121, 48 Cal.Rptr.2d 42, 906 P.2d 1196 (1995). As noted in the recent decision of *Esberg v. Union Oil Co. of Cal.*, 87 Cal.App.4th 378, 104 Cal.Rptr.2d 477 (2001), *petition for review granted* 107 Cal.Rptr.2d 616, 23 P.3d 1143 (May 16, 2001), §§ 12940 and 12941 were enacted together in 1980. While § 12940 has been amended continuously since its enactment, § 12941 has remained unaltered for twenty years. "The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended." *McDill v. Martin*, 14 Cal.3d 831, 837–38, 122 Cal.Rptr. 754, 537 P.2d 874 (1975) (citation omitted). Furthermore, "[w]here a statute with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed." *Committee of Sev-*

en Thousand v. Superior Ct. of Orange County, 45 Cal.3d 491, 507, 247 Cal.Rptr. 362, 754 P.2d 708 (1988) (citation omitted). *See also Brown v. Kelly Broadcasting Co.*, 48 Cal.3d 711, 725, 257 Cal.Rptr. 708, 771 P.2d 406 (1989) ("[W]hen the Legislature has carefully employed a term in one place and has excluded it in another, it should not be implied where excluded.") (citations omitted).

Therefore, Agency Defendants are not liable for age discrimination under the FEHA, and Plaintiffs' claim is dismissed with prejudice.

## F. DISCRIMINATION UNDER THE NYHRL

■ As first determined in *Sherwood v. Olin Corp.*, 772 F.Supp. 1418 (S.D.N.Y.1991), the New York State Human Rights Law does not provide a private civil remedy "to those who allege out-of-state discrimination by a non-resident person or a foreign corporation." [38] *Id.* at 1425; *accord Hammell v. Banque Paribas*, 780 F.Supp. 196, 199 (S.D.N.Y.1991); *Beckett v. Prudential Ins. Co.*, 893 F.Supp. 234, 238 (S.D.N.Y.1995). Furthermore, "[t]he NYHRL does not provide a non-[New York] resident with a private cause of action for discriminatory conduct committed outside of New York by a New York corporation." *Beckett*, 893 F.Supp. at 238 (citing *Iwankow v. Mobil Corp.*, 150 A.D.2d 272, 541 N.Y.S.2d 428, 429 (1989)).

■ Therefore, in order to state a cause of action under the NYHRL, at a

---

**37.** As the California Supreme Court noted, "Not all statutory interpretations, of course, are equally reasonable: the mere fact that one may make a theoretical and unsupported argument to broaden the scope of the [FEHA] statute or to narrow its exceptions does not necessarily mean the language at issue is legitimately susceptible of that interpretation. Our goal is to discern the apparent legislative intent ... not to adopt a judicial construction to give that [provision] the meaning we might believe most salutary." *Kelly v. Methodist*

*Hospital of Southern Cal.*, 22 Cal.4th 1108, 1114, 95 Cal.Rptr.2d 514, 997 P.2d 1169 (2000).

**38.** It appears that the term "foreign corporation" is meant to describe corporations foreign to the United States, not merely foreign to the State of New York. *See Hammell v. Banque Paribas*, 780 F.Supp. 196, 199 (S.D.N.Y.1991).

minimum, either the plaintiff must be a New York resident, or the discriminatory conduct must have occurred in New York. Here, Plaintiffs' complaint consists of only three individual Plaintiffs who are New York residents. *See* FAC, at ¶¶ 127, 168, 199. Additionally, Plaintiffs do not discuss the location of the allegedly discriminatory conduct,[39] but, according to the complaint, many of the Employer Defendants are California corporations and/or have their principal place of business in California, and only one Agency Defendant is a New York corporation, with none having its principal place of business in New York.

Plaintiffs argue that they are only bringing this action under the NYHRL "on behalf of those writers who are residents of New York or who have been denied, and/or been deterred from seeking, representation from agents of the Agency Defendants who maintain offices in New York." Plaintiffs' Opp'n, at 46. If this is their intention, it is certainly not evident on the face of their complaint. Nevertheless, if Plaintiffs wish to proceed in this manner, they must allege a separate class of Plaintiffs who are all similarly situated with respect to the applicable laws. Therefore, all claims under the NYHRL with respect to Plaintiffs who are non-residents of New York and are not alleging discriminatory acts occurring in New York are dismissed with prejudice. All other claims under the NYHRL are dismissed without prejudice and with leave to amend.

## IV. SECOND CAUSE OF ACTION: AIDING AND ABETTING (ADEA, FEHA, NYHRL)

Plaintiffs' Second Cause of Action alleges that Agency Defendants have aided and abetted Employer Defendants in willful violation of § 623 of the ADEA, § 12940 of the FEHA, and § 296 of the NYHRL. It also alleges that Employer Defendants aided and abetted Agency Defendants, Network Defendants aided and abetted Studio Defendants, and Parent Defendants aided and abetted their subsidiaries, in willful violation of § 12940 of FEHA, and § 296 of the NYHRL. Although the Court will address the sufficiency of Plaintiffs' aiding and abetting claims below, it is important to note that to the extent that Plaintiffs' "aiding and abetting" cause of action is merely a restatement of "industry-wide" joint and several liability, it fails for the reasons set forth above.

### A. ADEA

■ There is no express cause of action under the ADEA for aiding and abetting a violation of the ADEA. *See EEOC v. State of Illinois*, 69 F.3d 167, 169 (7th Cir.1995) ("[W]e find it implausible to impute to Congress an intention to create, by language not at all suggestive of any such intention, aider and abettor liability of one employer to the employees of another employer"); *Geiger v. AT & T Corp.*, 962 F.Supp. 637, 645 (E.D.Pa.1997) ("The ADEA does not mention liability for aiding and abetting discrimination . . ."); *see also* 29 U.S.C. § 623 (Age Discrimination in Employment Act, which includes no provision for aiding and abetting). In determining that a private plaintiff may not maintain an aiding and abetting suit under Securities Exchange Act § 10(b), the Supreme Court noted, "If . . . Congress intended to impose aiding and abetting liability, we presume it would have used the

---

**39.** However, in the opening paragraph of their complaint, Plaintiffs refer to a pattern or practice of discrimination promulgated by "every major studio, network and talent agency *in Hollywood*." FAC, at ¶ 1 (emphasis added).

words 'aid' and 'abet' in the statutory text. But it did not." *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 177, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994); *cf. Nance v. Maxwell Fed. Credit Union*, 186 F.3d at 1342–43 (holding that the ADEA does not allow for state law causes of action to make an "end run" around the federal statutory structure for age discrimination suits).

This Court therefore declines to create a cause of action under the ADEA for aiding and abetting, and, accordingly, Plaintiffs' claims against Defendants for aiding and abetting a violation of the ADEA are dismissed with prejudice.

### B. FEHA AND NYHRL

■ In contrast to the ADEA, the FEHA and the NYHRL do contain express provisions of liability for aiding and abetting. *See* Cal. Gov.Code § 12940(i);[40] N.Y. Exec. Law § 296(6). Since neither statute provides a definition of aiding and abetting, courts have looked to the common law definition. "[O]ne is subject to liability if he ... (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1979). *See Fiol v. Doellstedt*, 50 Cal. App.4th 1318, 1325–26, 58 Cal.Rptr.2d 308 (1996) (applying the Restatement defini-

tion to an aiding and abetting claim under the FEHA).

Plaintiffs' claims of aiding and abetting must be dismissed for two reasons: (1) as previously discussed, they have not adequately pled a claim of discrimination against any one particular Defendant; and (2) they have failed adequately to allege that any specific Defendant "substantially assisted" any other specific Defendant in discriminatory hiring.

In order to establish a cause of action for aiding and abetting discrimination, Plaintiffs must first allege that the discrimination occurred. Since the Court has previously dismissed Plaintiffs' discrimination claims without prejudice, Plaintiffs cannot proceed with this claim of aiding and abetting, until such time as they have properly alleged discrimination by a particular employer or group of employers. *See Stallings v. U.S. Electronics Inc.*, 270 A.D.2d 188, 707 N.Y.S.2d 9, 10 (2000) ("Absent discriminatory acts, the employer cannot be liable under the Human Rights Law for any aiding and abetting of the supervisor's conduct ..."); *Brodie v. New York City Transit Authority*, No. 96 Civ. 6813, 2000 WL 557313 at *1–2 (S.D.N.Y. May 5, 2000) (dismissing a claim of aiding and abetting under NYHRL § 296(6) where plaintiff had not adequately alleged a claim of unlawful discrimination).

Furthermore, both California and New York courts have held that "substantial assistance or encouragement" requires actual participation in the discriminatory conduct, and that failure to plead such actual participation is fatal to an aiding

---

**40.** Unlike the previous discussion regarding Agency Defendants' liability for age discrimination under the FEHA, § 12940(i) specifically makes it an unlawful employment practice "[f]or any person to aid, abet, incite, compel, or coerce the doing of *any of the acts forbidden under this part* ..." (emphasis added). "This part" is referring to Part 2.8, which encompasses the entire Fair Employment and Housing Act, and, hence, age discrimination under § 12941. *See, e.g., Reno v. Baird*, 18 Cal.4th 640, 655, 76 Cal.Rptr.2d 499, 957 P.2d 1333 (1998) (interpreting the phrase "any of the acts forbidden under this part" in § 12940(i) to mean "any of the acts forbidden by the FEHA").

and abetting claim. *See Monastra v. NYNEX Corp.*, No. 99 Civ. 8917, 2000 WL 1290596 at *7–8 (S.D.N.Y. Sept.12, 2000) ("[I]n order to hold [defendant] personally liable as an aider and abetter, plaintiff must establish that he 'actually participated in the conduct giving rise to a discrimination claim.'") (citations omitted); *Fiol*, 50 Cal.App.4th at 1325–26, 1331, 58 Cal. Rptr.2d 308.

This Court agrees with Plaintiffs in that the above cases do not imply that those accused of aiding and abetting in unlawful discrimination must have also affirmatively committed the underlying discriminatory acts. However, "substantial assistance or encouragement" does require that Plaintiffs allege more than the mere inaction of another party to prevent discrimination.

Here, Plaintiffs have not alleged that any one particular employer or talent agency has acted in any specific way to aid any other particular employer in discriminating against any particular Plaintiff or class of Plaintiffs. Plaintiffs simply make conclusory allegations that groups of Defendants have provided "substantial assistance and encouragement" to other groups of Defendants. *See* FAC, at ¶¶ 413, 420, 427, 434. The Court is not suggesting that there is a heightened pleading requirement for this claim, but, as it stands currently, Plaintiffs' entire aiding and abetting claim fails to provide adequate notice to each Defendant of the alleged wrongdoing at issue. *See Brodie*, 2000 WL 557313 at *2 (alleging discriminatory motive without "differentiating the role each [defendant] played in the alleged discrimination" was insufficient to state a claim for aiding and abetting under the NYHRL).

Based on the above, Plaintiffs' aiding and abetting claims are dismissed without prejudice and with leave to amend.

## V. THIRD CAUSE OF ACTION: CONSPIRACY (FEHA, NYHRL)

Plaintiffs allege that the entities within each Employer Defendant family have conspired with one another to discriminate in the hiring of writers over the age of forty in violation of the FEHA and the NYHRL. Plaintiffs' conspiracy claims fail as a matter of law.

Neither the FEHA nor the NYHRL recognize a claim for conspiracy. In this context, the provisions of the FEHA and the NYHRL are virtually identical and refer solely to aiding and abetting for concerted action under the statute. *See* Cal. Gov't Code § 12940(i) ("It shall be an unlawful employment practice ... [f]or any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."); N.Y. Exec. Law § 296(6) ("It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."). No case has imposed conspiracy liability under either statute. *See McPhatter v. Cribb*, No. 97–CV–0360, 1998 WL 401656 at *4 (W.D.N.Y. July 1, 1998), *aff'd*, 201 F.3d 431, 1999 WL 1295338 (2d Cir.1999) (dismissing the plaintiff's conspiracy claim under the NYHRL and stating that "this Court is not aware of any authority supporting the proposition that an employee can assert a conspiracy claim under the HRL.").

In their opposition brief, Plaintiffs do not continue to argue that a claim for conspiracy lies under the NYHRL. Plaintiffs confine their argument solely to the FEHA. Plaintiffs first argue that the § 12940(i) phrase "incite, compel, or coerce" provides a textual home for a conspiracy theory. Plaintiffs are incorrect. By enumerating the acts prohibited under the FEHA, Plaintiffs underscore the fact

that the statute *does not* include "conspiracy."

Plaintiffs next argue that since the underlying purpose of the FEHA is to be construed liberally, the Court should allow this cause of action. *See* Cal. Gov't Code § 12993 ("The provisions of this part shall be construed liberally for the accomplishment of the purposes thereof."). In support of this claim, Plaintiffs attempt to analogize this case with *Stevenson v. Superior Ct.*, 16 Cal.4th 880, 66 Cal.Rptr.2d 888, 941 P.2d 1157 (1997), in which the California Supreme Court found that a cause of action for wrongful discharge was permitted under the FEHA. The court concluded, after a lengthy analysis, that a purpose of the FEHA was to prevent discriminatory hiring decisions, and because the statute was not applicable to employers who have less than five employees, precluding a wrongful discharge claim from being brought against these employers would allow them to discriminate at will, which would violate the public policy underlying the law. *Id.* at 890–97, 941 P.2d 1157.

In contrast to a wrongful discharge claim, creating an claim for conspiracy would not further any aim of the FEHA. In order to prove civil conspiracy, it must be shown that the parties were guilty of the underlying offense, here, the discrimination. *See, e.g., Nicholson v. McClatchy Newspapers*, 177 Cal.App.3d 509, 521, 223 Cal.Rptr. 58 (1986) ("Conspiracy is not in itself a tort; it is simply a legal theory which will render all the participating members responsible for the wrong committed."). Therefore, unlike in *Stevenson*, where the plaintiff would have had no recovery otherwise, Plaintiffs here have a cause of action under the FEHA for the underlying offense, and thus there is not need to extend a cause of action for conspiracy in order to provide relief.

The California and New York legislatures carefully delineated the scope of liability for another's conduct, limiting it to those who "aid, abet, incite, compel or coerce the doing" of a prohibited act. Plaintiffs have not identified a single authority that allows a civil conspiracy claim to be brought under the FEHA or the NYHRL.[41] Accordingly, this Court will not allow such a claim here. Plaintiffs' Third Cause of Action for conspiracy under the FEHA and the NYHRL is hereby dismissed with prejudice.

## VI. FOURTH CAUSE OF ACTION: BREACH OF COLLECTIVE BARGAINING AGREEMENT

██ Plaintiffs' Fourth Cause of Action alleges breach of Article 38 of the CBA—prohibiting discrimination in employment—pursuant to § 301 of the LMRA (29 U.S.C. § 185). However, Plaintiffs do not have standing to bring such a claim.

██ "Individual employees have standing under section 301 . . . when they assert ' "uniquely personal" rights of employees such as wage, hours, overtime pay, and wrongful discharge.' " *Gutierrez v. United Foods, Inc.*, 11 F.3d 556, 559 (5th Cir.1994) (quoting *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976)). Generally, courts

---

**41.** Plaintiffs' reliance on *Saunders v. Superior Ct.*, 27 Cal.App.4th 832, 33 Cal.Rptr.2d 438 (1994) is unpersuasive. There, the court determined that a civil conspiracy claim was actionable under the California Business & Professions Code § 17200. Aside from being an unrelated statute with an entirely different purpose than the FEHA, that statute was silent with regard to concerted action, as evidenced by the fact that the court also allowed plaintiff to allege a common law aiding and abetting claim. Thus, unlike the FEHA, the legislature had not chosen to delineate particular concerted actions under which multiple defendants could be held liable, to the exclusion of other causes of action.

have been reluctant to extend the definition of "uniquely personal" rights, because the labor union is the party primarily responsible for enforcing the provisions of the CBA, especially where group or collective rights are at issue. *See Hill v. Ralphs Grocery Co.*, 896 F.Supp. 1492, 1496 (C.D.Cal.1995) ("The general rule is that only unions can litigate violations of labor agreements, and it is an exception for individuals to have standing under Section 301 of the L.M.R.A.").

In *Gutierrez*, the court considered the issue of standing to enforce a collective bargaining agreement. *Id.* at 557. In that case, an employer had sold its facility to another employer, and the subsequent employer discharged the employee plaintiffs. *Id.* at 557–58. The employees brought suit to enforce the successors and assigns clause in the collective bargaining agreement between their union and the prior employer. However, the union was not seeking to enforce the clause. *Id.* In evaluating standing, the court concluded, "[O]ur task is to determine whether the right being asserted by the plaintiffs is a uniquely personal right, and therefore amenable to individual enforcement, or a collective right of all union members, and therefore reserved to the union to enforce." *Id.* at 560. Ultimately, the court concluded that a successors and assigns clause, while providing personal benefits to employees, is "a right possessed by the bargaining unit as a whole". *Id.* at 562.

Other courts have followed the reasoning in *Gutierrez*. In *Hill*, the court held that individual employees lacked standing to enforce a successor clause, binding clause, and term of agreement clause, which would have preserved each of their jobs if enforced. *Id.*, 896 F.Supp. at 1497. The court noted that the rights asserted "ran to all employees in equal measure because they affect the employees as a collective unit." *Id.*

Plaintiffs do not argue with the reasoning of the above cases, but instead argue that the rights that they seek to enforce are in fact personal rights. While it is true that the right to be free from discrimination may be considered a personal right, as Plaintiffs assert, Plaintiffs are not bringing a suit alleging that they have been personally subjected to such discrimination. Instead, as Plaintiffs go to great lengths to articulate, Plaintiffs are asserting that all Employer Defendants have engaged in a collective pattern or practice of discrimination. Plaintiffs are not seeking individualized relief under the CBA, but instead seek to revamp the entire hiring structure of the television entertainment industry.[42] Such a claim clearly affects all members of the guild equally, and thus can only be brought by the union, and not by individual plaintiffs.

The cases Plaintiffs cite to support their position do not compel a different result.[43] Both *Gardner–Denver* and *Wright* stand for the proposition that an employee cannot generally waive his right to have his

---

**42.** Plaintiffs contend that even if they were barred from seeking injunctive relief, they would still have standing to seek damages. This rationale defies logic. If Plaintiffs demonstrate that there is a pervasive policy of age discrimination by each employer in the television industry that breaches Article 38 of the CBA, the result cannot merely be a damage award, but instead would require a complete restructuring of the employers' hiring practices. Otherwise, each employer would be liable for breach of the CBA to every member of the Guild as soon as that person reaches age forty!

**43.** *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998).

Title VII or ADA claims adjudicated, regardless of the substantive requirements of the CBA. *Gardner–Denver,* 415 U.S. at 51–52, 94 S.Ct. at 1021; *Wright,* 525 U.S. at 78–80, 119 S.Ct. at 396–97. However, no such waiver is occurring here. Plaintiffs are free to bring their ADEA claims in federal court, and have obviously chosen to exercise that right. Nevertheless, Plaintiffs also seek to hold the Employer Defendants liable for what amounts to a per se breach of Article 38 of the CBA, which requires a union-wide solution, and thus must be brought by the union itself.

Furthermore, a review of Article 38 itself provides further evidence why Plaintiffs do not have standing. Article 38 contains an anti-discrimination provision that is intended for the collective benefit of the entire bargaining unit, and includes various programs and mechanisms to help comport with the polices that it sets forth.[44] The policies are intended to benefit all protected classes, and are not limited to age discrimination. However, the sweeping, industry-wide solution that Plaintiffs seek with respect to alleged age discrimination in hiring would almost certainly affect other groups protected under Article 38 as well, and therefore may interfere with the provision's underlying purpose. Thus, under § 301, such a solution was intended to be implemented by the union, which is responsible for balancing the interests of all members, and not the individual Plaintiffs. *See Archer v. Airline Pilots Ass'n Int'l,* 609 F.2d 934, 938–39 (9th Cir.1979) (acknowledging the general principle that when Congress empowered unions to bargain exclusively for all employees in bargaining units, it thereby subordinated individual interests to interests of unit as a whole).

In light of the above discussion, Plaintiffs' cause of action for breach of the collective bargaining agreement, pursuant to § 301 of the LMRA, is dismissed with prejudice.

## VII. FIFTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

Plaintiffs' final cause of action alleges tortious interference by the Agency, Network, and Parent Defendants with the performance of the Employer, Studio, and Subsidiary Defendants' obligations under the CBA, respectively. This claim fails as a matter of law for three reasons. First, it is preempted by federal law, pursuant to § 301 of the LMRA, and § 301 does not allow a claim for tortious interference with contractual relations to be brought against a third party. Even if it was allowed, Plaintiffs do not have standing to litigate these claims under § 301, as indicated above. Second, Plaintiffs have not pled facts sufficient to support a claim of tortious interference with contractual relations against Agency Defendants. Third, a claim of tortious interference with contractual relations cannot be brought against a party to the contract, and thus cannot be brought against Employer Defendants.[45]

---

**44.** Article 38 requires the designation of an Equal Employment Officer by both the Guild and the employer, who are responsible for implementing the Article 38 programs. Additionally, Article 38 authorizes the meeting of a Human Resources Coordinating Committee upon request of either the employer or the Guild to review employment data, and to establish and supervise programs such as the

Writers Training Program, which is designed to provide employment opportunities to aspiring writers in protected categories. *See* CBA, at 284–88 (Defendants' Request for Judicial Notice, Ex. A).

**45.** Agency Defendants also argue that this claim is barred under the applicable six-month statute of limitations. In light of the

## A. § 301 FEDERAL PREEMPTION

 It is well-settled that state law causes of action based upon a collective bargaining agreement or whose outcome otherwise depends upon analysis of the collective bargaining agreement's terms are preempted by § 301 of the LMRA. *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409–10, 108 S.Ct. 1877, 1883, 100 L.Ed.2d 410 (1988); *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985) ("[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law.").

 The elements for a claim of tortious interference with contractual relations are: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Milne Employees Ass'n v. Sun Carriers, Inc.*, 960 F.2d 1401, 1411 (9th Cir.1991) (citing *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990)). It is clear that resolution of this claim would require an interpretation of the CBA, at least with regard to elements (1) and (4). Certainly, this Court could not determine whether there was a breach of the contract without construing the terms of the contract. Therefore, a state cause of action for tortious interference with contractual relations, where the underlying contract is a collective bargaining agree-

ment, is preempted by § 301. *See Milne Employees Ass'n*, 960 F.2d at 1411–12 ("[T]his court has generally found claims for interference with contractual relations and prospective economic advantage preempted by section 301."); *Scott v. Machinists Auto. Trades Dist. Lodge No. 190 of N. Cal.*, 827 F.2d 589, 591–92 (9th Cir. 1987); *Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1400–01 (9th Cir.1985).

In their opposition brief, Plaintiffs attempt to salvage their claim by arguing that it was brought under § 301 of the LMRA, and therefore not preempted. However, in their complaint, Plaintiffs make absolutely no reference to § 301 under this cause of action. Notwithstanding this deficiency, the Ninth Circuit has never recognized a cause of action for tortious interference under § 301.

Plaintiffs argue that both *Rozay's Transfer v. Local Freight Drivers, Local 208*, 850 F.2d 1321 (9th Cir.1988) and *Painting and Decorating Contractors Ass'n of Sacramento v. Painters and Decorators Joint Comm. of the E. Bay Counties, Inc.*, 707 F.2d 1067 (9th Cir.1983) support their contention that such a claim is actionable. Neither case provides such authority.

*Rozay's Transfer* dealt with whether a union's alleged misrepresentations during contract negotiations fraudulently induced the employer to execute the collective bargaining agreement. *Id.* at 1323. In affirming the district court's judgment for the employer, the Ninth Circuit held that *remedies* under § 301 may be fashioned after those found in tort, and are not limited to contract-type remedies. *Id.* at 1335. However, nowhere in that case does the

Court's decision to dismiss Plaintiffs' claim on other grounds, the Court declines to address

that argument here.

court say that a party may bring a tort action under § 301 that would require an interpretation of the terms of the collective bargaining agreement and a determination of whether or not there was a breach of that agreement.

In *Painters*, a breach of contract action was brought against a joint committee of employers established pursuant to the collective bargaining agreement. *Id.* at 1069–70. The Ninth Circuit decided that there was jurisdiction over the joint committee because § 301 did not require that the parties involved in the contract action be limited to the signatories of the allegedly breached collective bargaining agreement. *Id.* at 1071. However, the court never, as Plaintiffs would suggest, indicated that § 301 would permit a tort claim to be brought against a third party to a CBA. In fact, the Ninth Circuit has even described its holding in *Painters* to be "that a federal court may exercise jurisdiction over a state *breach-of-contract claim* against a nonsignatory in a section 301 action ..." *Milne*, 960 F.2d at 1407 (emphasis added).

Nevertheless, other circuits have read *Painters* to allow a tortious interference with contractual relations claim to be brought pursuant to § 301. *See Kimbro v. Pepsico, Inc.*, 215 F.3d 723, 726–27 (7th Cir.2000); *International Union, United Mine Workers of America v. Covenant Coal Corp.*, 977 F.2d 895, 897 (4th Cir. 1992). It is worth noting, however, that both *Kimbro* and *Covenant Coal* disagreed with that conclusion. The court in *Covenant Coal* stated that the majority of courts to address the issue of whether § 301 allows claims to be brought against non-signatories of a collective bargaining agreement for tortious interference with that agreement have concluded that it is not allowed. The court then declared that

it agreed with that conclusion. *Id.*, 977 F.2d at 897. The *Kimbro* court went a step further. That court stated, "A few cases fill the remedial gap by holding that section 301 creates a tort right against interference with a collective bargaining contract, e.g., ... *Painting & Decorating Contractors Ass'n of Sacramento, Inc. v. Painters & Decorators Joint Comm. of East Bay Counties, Inc.*, 707 F.2d 1067, 1070–72 (9th Cir.1983), but that can't be right, as section 301 creates a right of action only for breach of a collective bargaining agreement; it is not a tort statute." 215 F.3d at 726–27. Furthermore, *Kimbro* also cited the more recent Ninth Circuit case of *Milne Employees Ass'n v. Sun Carriers, Inc.*, supra, in support of the proposition that "a number of decisions bar on section 301 grounds tortious interference suits against third parties." *Kimbro*, 215 F.3d at 726. Again, no Ninth Circuit case has ever construed *Painters* to allow a claim for tortious interference with contractual relations under § 301 to lie.

The Court recognizes, however, that not allowing such a claim creates an unsettling result, in that a plaintiff is left actionless with regard to suits for tortious interference with a collective bargaining agreement. Moreover, two main purposes of the preemption rule, which are to allow for a uniform interpretation of the collective bargaining agreement, and to preserve the role of arbitration in these agreements,[46] are not really satisfied in this instance. The terms of Article 38, unlike most of the CBA, do not compel arbitration, so the decision of whether the contract was breached based on that provision is within the jurisdiction of this Court.

Nevertheless, as discussed in the previous section, the Plaintiffs here are not

---

46. *See Allis–Chalmers*, 471 U.S. at 210, 220, 105 S.Ct. at 1910–11, 1915.

permitted to bring a breach of contract action seeking to reform the Employer Defendants hiring practices, because such an action must be brought by the union. Thus, if an action for tortious interference with contractual relations was permitted in this case, it would simply be a recharacterization of the breach of contract claim as one in tort, which is also forbidden under § 301. *See Kimbro,* 215 F.3d at 725 (citing *United Steelworkers of America v. Rawson,* 495 U.S. 362, 369, 371–72, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990)). Since the Court has held that the Plaintiffs are not permitted to bring this breach of contract action under § 301, it therefore comports with the policies of § 301 to preclude Plaintiffs from bringing essentially the same action as a tortious interference with contractual relations claim.

Regardless, even if such a claim was available under § 301, which this Court has decided otherwise, this claim must still be dismissed for two additional reasons. First, Plaintiffs have not pled facts sufficient to support a claim of tortious interference with contractual relations against Agency Defendants. Second, Plaintiffs contend that Employer Defendants are parties to the CBA, and a party to a contract cannot be sued for tortious interference with that contract.

## B. FAILURE TO STATE A CLAIM AGAINST AGENCY DEFENDANTS FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

As an element of a tortious interference with contractual relations claim, Plaintiffs must plead facts sufficient to support an inference that Agency Defendants intended to cause the alleged breach. *See Pacific Gas & Elec. Co. v. Bear Stearns & Co.,* 50 Cal.3d at 1126, 270 Cal.Rptr. 1, 791 P.2d 587; *Fisher v. San Pedro Peninsula Hospital,* 214 Cal.App.3d 590, 619, 262 Cal.Rptr. 842 (1989).

Plaintiffs have not satisfied this pleading requirement. They have not alleged any facts that would indicate any intention on behalf of the Agency Defendants to preclude Plaintiffs from gaining employment with the Employer Defendants. In fact, they have alleged almost the opposite. Plaintiffs acknowledge that the Agency Defendants' "business depends upon their ability to land jobs for their clientele with Hollywood employers. Understanding the premium that those employers place on youth, these agencies have been extremely reluctant to take on any new clients over the age of forty." FAC, at ¶ 291. Essentially, all that Plaintiffs are accusing Agency Defendants of is the failure to combat the alleged discriminatory hiring preferences of the Employer Defendants. That is certainly not a duty on the part of the Agency Defendants—under contract law, tort law, or § 301—and the failure to act in that way does not equate to an intent to cause a breach of contract. Moreover, while the following conclusion is not necessary for this Court's holding, any suggestion that Agency Defendants would refuse to represent older writers, absent a preference from Employer Defendants, is inherently implausible. As Plaintiffs have indicated, Agency Defendants are dependant on the needs of Employer Defendants. If Employer Defendants had requested referral of older writers, it would defy logic to assume that Agency Defendants would not comply, for then they would no longer be able to sustain a business as a talent agency.

Furthermore, Plaintiffs have also failed to allege facts sufficient to allow an inference that the Employer Defendants otherwise would have performed had the Agency Defendants not interfered, which is a requirement to establish causation. *See*

*Dryden v. Tri–Valley Growers,* 65 Cal. App.3d 990, 997, 135 Cal.Rptr. 720 (1977) ("[A] plaintiff, seeking to hold one liable for unjustifiably inducing another to breach a contract, must allege that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof."); *Beckner v. Sears, Roebuck & Co.,* 4 Cal.App.3d 504, 507, 511–12, 84 Cal.Rptr. 315 (1970).

Plaintiffs fail in this regard for three reasons. First, by their own admission, Plaintiffs have indicated that individual Plaintiffs can apply for jobs with Employer Defendants without the assistance of the Agency Defendants. Therefore, Agency Defendants cannot be the cause of the alleged breach, because Employer Defendants could have hired Plaintiffs anyway. However, as alleged in the complaint, even when individual Plaintiffs were able to secure representation, or when they sought employment on their own, they were still often unsuccessful in obtaining employment from Employer Defendants. *See, e.g.,* FAC, at ¶¶ 87, 91, 95, 103, 118, 130, 134. Second, Plaintiffs have also indicated throughout their complaint that Employer Defendants actions were motivated by their own ageist policies, independent of any behavior on behalf of Agency Defendants. Thus, there is no indication that Plaintiffs would have been hired, even without any alleged interference on the part of the Agency Defendants. Third, each Agency Defendant can only be liable for its own hiring and representation decisions. It is not liable for the actions of any other Agency Defendant, insofar as that other Agency Defendant is a completely independent and distinct talent agency. Therefore, because there are several talent agencies in the television industry (twelve are named in this case alone), and Plaintiffs do not contend that they act in con-

cert, Plaintiffs must allege facts sufficient to allow the inference that a refusal to refer older writers by any one Agency Defendant is capable of causing a breach or a disruption of the contractual relationship for all Employer Defendants. Plaintiffs have not even attempted to make this showing.

Plaintiffs' only response to these pleading deficiencies is their argument that they adequately stated a claim in the complaint when they alleged that "Agency Defendants have purposefully and intentionally interfered with Employer Defendants performance of those obligations [under the CBA]." FAC, at ¶ 455. Plaintiffs argue that "no further allegations are required in order to properly plead the intent element of a tortious interference claim." Plaintiffs' Opp'n, at 48. However, it is a basic tenet of pleading requirements that in construing whether a complaint satisfies the requirements under Fed.R.Civ.P. 12(b)(6), a court need not accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See, e.g., Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–55 (9th Cir. 1994). The mere allegation that Agency Defendants "purposefully and intentionally interfered" with a contract, without any factual support, and actually contrary to the facts that are alleged in the complaint, does not satisfy the requirements for stating a claim for tortious interference with contractual relations. Therefore, Plaintiffs' claim against Agency Defendants must be dismissed.

## C. EMPLOYER DEFENDANTS' LIABILITY FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

Finally, any Defendant who is a signatory to the CBA must be dismissed for the additional and independent reason

that, as a matter of law, a party to a contract cannot tortiously interfere with the contract. *ESI, Inc. v. Coastal Power Production Co.*, 995 F.Supp. 419, 433 (S.D.N.Y.1998) ("[I]n order for a defendant to tortiously interfere with a contract, it must be a third party unrelated to the contract."); *Applied Equip. Corp. v. Litton Saudi Arabia, Ltd.*, 7 Cal.4th 503, 514, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994) ("[T]he tort cause of action for interference with contract does not lie against a party to the contract."). Here, Plaintiffs have pled that all of the Employer Defendants are contractually obligated under the CBA. *See* FAC, at ¶ 448.

■■■ Contrary to established law, Plaintiffs contend that the above rule does not apply where one party to the contract interferes with the performance of another party to the contract. Not surprisingly, Plaintiffs do not cite one case to support this argument. On the contrary, as the California Supreme Court stated in *Applied Equipment Corp.*, "One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." *Applied Equipment Corp.*, 7 Cal.4th at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454. Therefore, Plaintiffs' claim of tortious interference with contractual relations against Employer Defendants fails as a matter of law.

In light of the above discussion, Defendants cannot be held liable for tortious interference with contractual relations, and thus Plaintiffs' Fifth Cause of Action is dismissed with prejudice.

## VIII. DEFENDANT STUDIOS USA LLC'S MOTION TO DISMISS

Defendant Studios USA LLC filed a separate motion to dismiss, alleging grounds unique to that Defendant. It requests the Court to take judicial notice of the fact that it was formed on February 1998, and then argues that because this suit seeks to remedy alleged industry-wide discrimination occurring since "at least the early 1980's," allegations predating its formation should be dismissed with prejudice.

This Court has already ruled that all claims alleging joint and several liability for "industry-wide" discrimination are dismissed with prejudice, and that all other claims against Employer Defendants alleging age discrimination based on that particular Defendant's actions are dismissed without prejudice. These rulings apply with equal force to Studios USA. Therefore, Defendant Studios USA LLC's motion to dismiss is granted, in accordance with the Court's previous rulings contained in this order.

## IX. CONCLUSION

As set forth above, the Court grants in part Employer Defendants' and Agency Defendants' motions to dismiss, grants Employer Defendants' and Agency Defendants' motions to sever, and grants Studio USA's motion to dismiss. More specifically, the consequences of this order are as follows:

First Cause of Action: ADEA claims against Employer Defendants are dismissed without prejudice and with leave to amend; ADEA claims against Agency Defendants are dismissed with prejudice; FEHA claims against Employer Defendants are dismissed without prejudice and with leave to amend; FEHA claims against Agency Defendants are dismissed with prejudice; NYHRL claims are dismissed without prejudice and with leave to

amend; all claims alleging joint and several liability for "industry-wide" discrimination are dismissed with prejudice; all "deterred applicant" claims are dismissed without prejudice and with leave to amend; all claims of discrimination under ADEA, FEHA, and NYHRL alleging company-wide discrimination must be brought against each employer or related group of employers separately.

Second Cause of Action: ADEA claims are dismissed with prejudice; FEHA claims are dismissed without prejudice and with leave to amend; NYHRL claims are dismissed without prejudice and with leave to amend; all claims alleging joint and several liability for "industry-wide" discrimination are dismissed with prejudice.

Third Cause of Action: all claims are dismissed with prejudice.

Fourth Cause of Action: all claims are dismissed with prejudice.

Fifth Cause of Action: all claims are dismissed with prejudice.

IT IS SO ORDERED.

### *APPENDIX A*

### Analysis of Plaintiffs' Statistical Argument

Plaintiffs argue that Defendants' employment practices have deterred some discrete group of plaintiffs over forty years old from seeking employment as writers for Defendants. Plaintiffs invoke the proposition that "a plaintiff may base a deterrence claim on a significant statistical disparity between the percentage of members of the protected group in the relevant labor pool and the percentage of members of the protected group actually hired." Plaintiffs' Opp'n, at 2. In support of this theory, Plaintiffs argue in their briefs that statistically Defendants have actually discriminated because "the disparity in employment rates between writers over 40 and writers under 40, as shown by the figures in the Guild report, is measured by *16* standard deviations." Plaintiff's Surreply, at 1. This argument expands upon Plaintiffs' claim that "writers under the age of 40 were hired at rates much higher than that of older writers." Plaintiffs' Opp'n, at 17.

At this stage in the litigation, Plaintiffs must state a non-conclusory claim. In other words, they must allege facts that, when taken as true, are sufficient to support a claim that would entitle Plaintiffs to relief. Some of the "facts" alleged by Plaintiffs are the statistical assertions mentioned above, allegedly derived from the statistics referenced in the complaint, which Plaintiffs claim demonstrate the existence of age discrimination in Defendants' hiring practices. However, just as Plaintiffs must state a non-conclusory claim, there must be a discernable basis underlying Plaintiffs' statistical assertions as well. There is no such basis here. With regard to Plaintiffs' "sixteen standard deviations" assertion, that assertion does not report results from any regression or inference testing, but merely compares descriptions of some data populations.[47] What those populations are, and their exact relevance to Plaintiffs' burden of raising an inference of discrimination, remains unclear. Evan the simple invocation of "sixteen standard

---

**47.** At least one employment law treatise has suggested that the proper use of statistics in a pattern-or-practice claim is to use a valid regression analysis to demonstrate that membership in a protected class is the explanation for an imbalance in employment rates, to a level of scientifically accepted statistical significance. "Generally, a statistical study is viewed as statistically significant if the probability that the result is attributable to chance alone is less than 1 out of 20." Kathleen M. Lucas, Angel Gomez III, and Judge Diane Wayne, *California Civil Practice—Employment Litigation*, § 2:22 (1993).

deviations" is unclear. The "employment rate" of television writers under forty at any given time consists of the number of television writers under forty employed as television writers, divided by the entire number of people working or seeking employment as television writers (the relevant labor pool). Similarly, the "employment rate" of television writers forty and over at any given time consists of the number of television writers forty and over employed as television writers, divided by the entire number of people working or seeking employment as television writers. The sum of these ratios provides the "employment rate" for the industry of television writers. There is no specific indication of what relevant time period frames the statistical analysis.

These "employment rates" are themselves parameters, not distributions. A distribution of two statistics (employment rates for those over, and under, forty) has no statistical meaning. More probative for this action is a comparison of the age distribution of people employed as television writers to the age distribution of the labor pool—those employed or seeking work as television writers. Plaintiffs might argue, for example, that a statistically significant difference between means of those distributions supports the inference that Defendants age discriminate in hiring. In that context the distance between means might be measured in terms of a standard distribution—but that standard distribution must be tied to one of the populations, either the employed pool or the labor pool. The proper measure must be the standard deviation of the labor pool.

The inadequacy of Plaintiffs' allegation is underscored by the insufficiency of the data upon which Plaintiffs rely in order to support their claim. The data provided in the Guild Report provides the Court with some panel and time series descriptions of the distribution of employed television writers. It reveals much less about the relevant labor pool. Focusing on just the 1997 panel data, the report indicates that in 1997, 2976 people were employed as television writers. Guild Report, at Table 4. Of those, 1597—or 54%—were writers over forty. *Id.* While neither the Guild Report nor the Plaintiffs identify the mean age of the distribution of employed television writers, it appears that in 1997 the mean age for employed television writers was greater than 40. Guild Report, at Table 23.

The Guild Report describes the age-distribution of employed television writers in 1997 as clustered within the ages of thirty-one to fifty, with a larger tail to the right. *See* Guild Report, at Table 23.[48] The Court has no reason to think that the age distribution of employed television writers in 1997 mirrors the age distribution of the combined population of employed television and film writers, but if it did the bulk of employed writers would cluster within the ages of thirty-one to fifty, with a larger tail to the right (at higher ages).[49] *See* Guild Report, at Table 7.

---

**48.** To the extent that the figures in the Guild Report are legible, they indicate the following age distribution for employed television writers in 1997: for writers aged less than 31 years, 249; ages 31–40, 956; ages 41–50, 1083; ages 51–60, 369; ages 61–70, 92; ages 71–80, 24; and 81 and over, 2. Of unknown age were 174; 27 were over forty, but of unknown age. *See* Guild Report at Table 23.

**49.** If anything, the sum of the age-distribution of employed television writers with the age-distribution of employed film writers might, by the law of large numbers, drive the resulting distribution towards a normal distribution. Instead of resulting in a normal distribution, however, the result described in Table 7 appears to have greater skew to the right—e.g., towards employing older writers.

Focusing on the data in Table 23 for employed television writers in 1997, the coarseness of the ten-year baskets in this panel data renders any standard deviation calculation of little value in describing the relevant age distribution, and in any event that calculation is not presented to the Court. While the standard deviation of the employed population is not the yardstick by which Plaintiffs may support their claim, it is probative of the significance of the mean age of the employed population against which Plaintiffs would compare the mean age of the labor pool: as the variance of the employed-writer age-distribution increases, the mean becomes less and less representative of the population as a whole and a weaker predictor of the age of an employed writer randomly selected from that population. That in turn weakens the probative value of Plaintiffs' comparison—had Plaintiffs presented such a comparison as a factual basis for its discrimination claim, which they did not.

Plaintiffs identify nothing on which to found an analysis of the age-distribution of the relevant labor pool—people employed or seeking work as television writers. In general terms, that survey reports high unemployment among responding Guild members of all ages. At best the Guild Report contains a panel breakdown, in five-year age baskets, of survey results for five hundred Guild members in 1991 about whether they were seeking work or working. *See* Guild Report, at Table 8, Figure 10. The Court finds it instructive to consider what that survey evidence does not indicate. First, the survey does not distinguish between television and film writers, while the relevant labor pool in this case is only television writers. In fact, the survey does not indicate that the respondents were seeking work as writers, or whether they were seeking work in the entertain-

ment industry, or whether they were just seeking work in general. Second, the survey only presents data for 1991, not for 1997 or any of the other years for which television writer employment data is also reported. Third, there is nothing that indicates either why the Guild membership is representative of the relevant labor pool in general—and in particular, of the age distribution of the relevant labor pool. Similarly, there is nothing that indicates why the five hundred individuals surveyed are representative of the age-distribution in the relevant labor pool; or even more precisely why those Guild members that responded to the survey are representative of the age-distribution in the relevant labor pool.

What the Guild Report does show is that the age distribution of those members that responded to the survey in 1991 is weighted towards people aged forty and over. *See* Guild Report, at Table 8. While the respondents to the survey may cluster around ages 30 to 45, the difference in numbers of respondents with other age baskets is not as striking as in the distribution of employed television writers. In other words, the survey results appear to have a larger variance despite the greater sampling precision using five year age baskets. That again reduces the significance of any calculated mean based upon the survey, which Plaintiffs invite the Court to consider representative of the relevant labor pool. Again, however, the analysis was not done, and the summary statistics describing the distribution of the survey report—let alone the relevant labor pool—were not provided.

In conclusion, a facial reading of the complaint and the documents on which it relies fails to provide the source or meaning of Plaintiffs' assertion that "the disparity in employment rates between writers over 40 and writers under 40, as shown by

the figures in the Guild report, is measured by *16* standard deviations."